STATE OF CONNECTICUT *v.* RALPH VAUGHN, JR.
(11891)

HEALEY, SHEA, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued January 16—decision released May 13, 1986

*Thomas J. Ullman,* assistant public defender, with whom was *Joette Katz,* public defender, for the appellant (defendant).

*Robert J. O'Brien,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Roseann Bocciarelli,* legal intern, for the appellee (state).

DANNEHY, J. The defendant, Ralph Vaughn, Jr., was charged with the crime of robbery in the second degree in violation of General Statutes § 53a-135 (a) (1). The defendant moved before trial for a lineup and to suppress identification testimony. After an evidentiary hearing, the court, *Chernauskas, J.,* denied the defendant's pretrial motions. Following a jury trial in which the defendant was found guilty of the lesser included offense of robbery in the third degree in violation of General Statutes § 53a-136, he was sentenced to a term of imprisonment of five years. In his appeal the defendant contends that the trial court erred in refusing to order a pretrial lineup and in denying his motion to suppress identification testimony. These contentions are interrelated and the contention basic to the entire argument is the reliability of the identification testimony of the victim of the robbery. The defendant also argues that the trial court committed reversible error by admitting evidence that related to other crimes. We find no error.

The testimony adduced at the hearing on the pretrial motions for a lineup and to suppress identification testimony was substantially the same as that given at trial. The evidence presented was not complicated. To the contrary, the principal issue of fact before the jury was whether they believed the victim and his identification testimony despite the testimony of the defendant and his alibi witnesses.

There is no controversy as to the occurrence of the robbery itself. The victim, Eugene Cornelius, testified that at about 8:15 in the evening of November 19, 1981, he was walking on Chapel Street near the corner of

Kensington Street in New Haven when he was accosted by two men. The street lighting was good in the area and nothing obstructed his view of the two men facing him. He saw one of the men step toward him, and, for several seconds, Cornelius stood staring at the man he identified as the defendant, who was only about six feet away and closing in upon him. The man was unmasked and made no attempt to hide his identity. Cornelius consistently testified that he was positive of his identification of the defendant, but that he had not had the opportunity to get a good view of the other man. Throughout the period he eyed him continuously until he was distracted by something he heard behind him. As he turned his head forward to face the defendant again, Cornelius was struck and slumped to the sidewalk where he collapsed. He awoke while the robbers were going through his pockets. They stole his wedding ring, wristwatch, briefcase and his wallet which contained money, charge cards, his driver's license and a Mobil credit card. After the robbers ran away, the victim found his glasses which had fallen off and he called the police.

New Haven police department officers Phillip Timothy and Dennis Kelly were on patrol duty when they were dispatched to the intersection of Chapel and Kensington Streets. There they found Cornelius. He was described by the police as upset and physically battered, and his face was described as bruised, bleeding, and his teeth as chipped. Cornelius was briefly questioned. He stated that he had just been mugged by four black males; that he was hit from behind; and that he did not see the person who assaulted him. Cornelius said on this occasion that he was unable to identify any of his assailants. He later testified that throughout the time he was with the police officers he was dazed and in pain, emotionally disturbed and afraid. Shortly thereafter the victim was taken by Timothy to a nearby

hospital for medical assistance. Kelly remained at the scene of the crime to continue the investigation. He found nothing. He then rejoined Timothy at the hospital. Further questioning elicited no additional information. Before leaving Cornelius at the hospital, both officers advised him that if he had any further information to contact the police department. Kelly also informed him that photographs were available at the police department, if he wanted to view them.

The next day while he was at the office of his dentist to undergo treatment of his damaged teeth, Cornelius recalled his encounter with the defendant on the previous evening. What happened was clear in his recollection. He remembered the defiant, fearless expression on the defendant's face. He recalled how he stood only about six feet from the defendant and, aided by the illumination provided by good street lighting, observed that the man before him was a muscular black male, about twenty-five years old, five feet, five or six inches tall, weighing approximately 150 pounds, of average complexion, with very short hair and no distinctive facial features or facial hair except a small mustache. Later that day he wrote down a description of the defendant. On November 21, 1981, Cornelius contacted the police with reference to his briefcase. He then went with a police escort to the intersection of Chapel and Kensington Streets. A search for the briefcase was fruitless. He did not indicate to the police at that time that he could identify any of the robbers.

Nothing else happened until the middle of January, 1982. About that time Cornelius was furnished a statement indicating the current balance of his Mobil credit card. The summary of activity showed charges for gasoline he had not purchased. Cornelius immediately contacted the police. Officer Stephen Dunn was assigned to investigate the misuse of the credit card. On February 5, 1982, Cornelius told Dunn that only one person

assaulted him and described his assailant as a short, black male with a stocky build. On February 9, 1982, Cornelius notified Dunn that he had received by mail an envelope which contained his driver's license. On February 12, 1982, Cornelius and Dunn exchanged additional information. Dunn reported to Cornelius that he had recovered the Mobil credit card and had interviewed the attendant at the gasoline station where the credit card was used. Cornelius then disclosed to Dunn that he could identify the person who struck him. He told Dunn that he had written down a detailed description of the man on the day following the robbery, including the man's height, weight, build, age and hair length. Dunn at once suggested that the victim attempt to make a photographic identification. Cornelius gave further details of the description in the course of arrangements for a photographic array. Before he looked at any pictures Cornelius gave his written description of the defendant to Dunn.

On February 24, 1982, Dunn brought Cornelius an array of twelve photographs and asked him to take his time and to look at the photographs. Cornelius scrutinized the pictures, removed three or four from the array, and looked at the remaining photographs for about one minute. He picked out the defendant's picture and told Dunn he was positive he had selected his attacker's picture. At trial, Cornelius testified that he was robbed on November 19, 1981, that he had an opportunity to observe the man he identified as the defendant at close quarters for several seconds in good lighting, that he wrote down a detailed description of the man on the day following the robbery, that he did not tell the police what he had done or give them the written description until February 24, 1982, that he had been shown twelve photographs on February 24, 1982, and that he had identified one photograph as that of the robber facing him on November 19, 1981.

The defendant's first contention was raised by a request for a pretrial lineup. After hearing evidence, the trial judge refused the request. This ruling the defendant contends is error. In support of this contention, the defendant argues that since identification of the defendant was the main issue at trial, it was an abuse of discretion for the trial judge to refuse his request for a corporeal lineup. This argument is based on the theory that it was improper to show the victim photographs which made it possible for him to identify in court not the defendant, but the person whose picture he had previously selected from the array prepared by the police. The defendant urges condemnation of any identification procedure which utilizes photographs, even though prior to arrest, unless the danger that use of the technique may result in conviction based on misidentification is lessened by a defendant's right to a corporeal lineup.

A defendant does not have a constitutional right to a lineup. *United States* v. *Sebetich,* 776 F.2d 412, 420 (3d Cir. 1985); *United States* v. *Archibald,* 734 F.2d 938, 941 (2d Cir. 1984); *United States* v. *Brown,* 699 F.2d 585, 593 (2d Cir. 1983). "If the state has not employed unduly suggestive methods of identification, its only remaining duty is to prove beyond a reasonable doubt at trial that the identification is correct." *State* v. *Vass,* 191 Conn. 604, 611, 469 A.2d 767 (1983); see *State v. Ledbetter,* 185 Conn. 607, 612, 441 A.2d 595 (1981); *State* v. *Williams,* 170 Conn. 618, 626–27, 368 A.2d 140 (1976). The only provision for a lineup is that contained in Practice Book § 782. Under that section, the "judicial authority by order may direct the prosecuting authority to arrange for the defendant's participation in [a lineup] if the judicial authority finds that the evidence sought could contribute to an adequate defense." A ruling under Practice Book § 782 is within the sound discretion of the trial court. We do not believe

that this discretion was abused in light of our disposition of the defendant's remaining claims.

The defendant claims that the pretrial photographic identification was unduly suggestive and irreparably tainted the victim's subsequent identification of the defendant in court. "We have repeatedly held that a conviction based on an in-court identification which follows an out-of-court photographic identification will be set aside only 'if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' *State* v. *Fullwood,* 193 Conn. 238, 243–44, 476 A.2d 550 (1984), quoting *Simmons* v. *United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); *State* v. *Vass,* [supra, 609]; *State* v. *Doolittle,* 189 Conn. 183, 190, 455 A.2d 843 (1983). ' "A defendant who moves to suppress identification evidence bears the initial burden of proving that the identification resulted from an unconstitutional procedure." ' *State* v. *Hinton,* 196 Conn. 289, 293, 493 A.2d 836 (1985); *State* v. *Fullwood,* supra, 244. The determination whether an identification procedure has violated a defendant's due process rights must be made on an ad hoc basis. The inquiry is two-pronged: ' "[F]irst, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the 'totality of the circumstances.' " ' *State* v. *Hinton,* supra, 292–93, quoting *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); *State* v. *Austin,* 195 Conn. 496, 499, 488 A.2d 1250 (1985)." *State* v. *Parker,* 197 Conn. 595, 598, 500 A.2d 551 (1985).

The defendant concedes that the photographic array was not presented to Cornelius in a suggestive manner. He contends, rather, that Cornelius may have been

subliminally influenced by marginally perceptible differences in the photographs themselves. He claims that four of the photographs depict "dark skinned black males," another shows a "light skinned . . . black male," while the defendant is a "black male of medium complexion." The defendant purports to eliminate two additional photographs as depicting black males "significantly older" than he. The defendant concludes that "[t]his leaves five photos," with only his own depicting an individual in a "light colored shirt, seemingly standing out within that group."

We have viewed the challenged array and agree with the defendant that any suggestiveness based on skin color or age of the individuals depicted, or on the color of their shirts, would indeed, and at best, be subliminal. Any array composed of different individuals must necessarily contain certain differences. Four of the individuals depicted are wearing light colored shirts or sweaters. Four others are wearing dark outer garments. The remaining four are wearing either dark colored sweatshirts or light colored outer garments. In short, all of the photographs show individuals wearing a normal variety of clothes. All of the photographs show individuals who appear to range in age from the early twenties to the early thirties. The defendant appears to fall somewhere in the middle of this age group. The black and white photos used in the array were obviously taken at different exposures. Thus, it is nearly impossible to distinguish between varying shades of actual skin color. In any event, the defendant's skin color is not significantly lighter or significantly darker than that of any other individual shown in the array. We fail to perceive the differences noted by the defendant.

The defendant raises a more substantial claim that his photograph bears the date of February 11, 1982. That date is significant because on February 12, 1982,

Dunn called Cornelius to inform him that police had recovered his stolen credit card, and that a suspect had been apprehended. While the dates on the police placards should have been covered, there is nothing in the record to indicate that Cornelius even noticed them when he was asked to view the array. Moreover, ten of the twelve placards in the photographs show dates ranging between January 27, 1982, and February 13, 1982. Thus, to the extent that Cornelius observed and considered the dates on the photographs, he would have had to select among ten individuals arrested during the relevant period. We hold that the array used in this case was not unnecessarily suggestive, and, therefore, we need not consider the defendant's further claim that it was unreliable.

There was also testimony that the victim's Mobil credit card was traced to the defendant. A gasoline station attendant identified the defendant as having used the victim's credit card on four or five occasions. He also identified the credit card slips bearing his initials and followed by the victim's signature as written by the defendant. Prior to trial, the defendant filed a motion to exclude any evidence concerning the use by the defendant of the victim's stolen Mobil credit card. The motion was denied. At trial, the defendant objected to the testimony being admitted into evidence, and the objection was overruled.

While it is true that evidence of crimes which are independent of those for which a defendant is on trial is generally inadmissible, it is also true that evidence of other crimes is admissible when the evidence is substantially relevant for some other purpose than to show that the defendant committed the crime on trial because of his criminal character. *State* v. *Crosby,* 196 Conn. 185, 190, 491 A.2d 1092 (1985); *State* v. *Esposito,* 192 Conn. 166, 169, 471 A.2d 949 (1984); *State* v. *Braman,* 191 Conn. 670, 676, 469 A.2d 760 (1983); *State* v.

*Howard,* 187 Conn. 681, 685, 447 A.2d 1167 (1982). In this case the testimony of the gasoline station attendant was properly admitted as tending to show the identity of the person charged with the commission of the crime on trial. There was ample reason to admit the testimony and there was no abuse of discretion by the trial judge in its admission.

The defendant attempted to refute the evidence implicating him by establishing an alibi defense supported by the testimony of others. He called Allen Felder who testified that the defendant found the Mobil credit card in Ivy Park in New Haven sometime in November or December of 1981. Charlotte Vaughn, his mother, and Yvette Reddick, his girlfriend and the mother of his child, testified that the defendant was in Brooklyn, New York, on the date of the robbery. The credibility of such witnesses was a question for the jury. The jury decided the question adversely to the defendant. *State* v. *Monk,* 198 Conn. 430, 435, 503 A.2d 591 (1986); *State* v. *Hart,* 198 Conn. 424, 427–28, 503 A.2d 588 (1986).

There is no error.

In this opinion the other judges concurred.