STATE OF CONNECTICUT *v.* JAMES BOSCARINO
(12667)
(12684)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and F. HENNESSY, Js.

Argued June 9—decision released August 11, 1987

*G. Douglas Nash,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellant (defendant in each case).

*Harry Weller,* deputy assistant state's attorney, with whom, on the brief, were *Dennis O'Connor,* assistant state's attorney, and *Mark Buebendorf,* legal intern, for the appellee (state).

PETERS, C. J. The principal issue in these appeals is whether the trial court abused its discretion in permitting the defendant to be tried jointly on charges arising from four factually similar, but legally unrelated cases. The defendant, James Boscarino, was charged by information with one count of kidnapping in the first degree in violation of General Statutes

§ 53a-92 (a) (2) (B);[1] three counts of assault in the second degree in violation of General Statutes § 53a-60 (a) (2);[2] and one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a)[3] (the South Windsor case). In a separate information in another case, he was charged with one count of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1),[4] and three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (the Bloomfield case). These two cases, along with two other cases that also involved alleged sexual assaults (the Windsor cases), were consolidated for trial before a single jury. On July 12, 1984, the jury rendered verdicts of guilty in the South Windsor and Bloomfield cases, and of acquittal in the Windsor cases.

[1] "[General Statutes] Sec. 53a-92. KIDNAPPING IN THE FIRST DEGREE. (a) A person is guilty of kidnapping in the first degree when he abducts another person and when: (1) His intent is to compel a third person to pay or deliver money or property as ransom, or to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function."

[2] "[General Statutes] Sec. 53a-60. ASSAULT IN THE SECOND DEGREE: CLASS D FELONY. (a) A person is guilty of assault in the second degree when . . . (2) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[3] General Statutes § 53a-70 (a) provides: "A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

[4] "[General Statutes] Sec. 53a-101. BURGLARY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument, or (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

The defendant was sentenced to a total effective term of twenty years imprisonment. He appeals from the judgments of these convictions. We find error.

The jury could reasonably have found the following facts. The charges against the defendant in the South Windsor case arose from an incident that occurred on March 3, 1982. The victim was at work at her place of employment in South Windsor when a man approached her, unnoticed, from behind. The assailant reached around the victim's neck and cut her face with a small knife that he held in his right hand. He then pushed the victim into an adjoining room, where he asked her to remove her clothes. The victim initially refused to do so, but complied after the assailant cut her with the knife several times on her chest and stomach. The assailant then sexually assaulted her. Later that day, the victim described him to police as a white male in his early twenties, with a medium build, dark hair and a beard and mustache.

The charges against the defendant in the Bloomfield case arose from a June 14, 1983 sexual assault. In that case, the victim was awakened early in the morning in the bedroom of her Bloomfield condominium by a man, naked except for socks and sneakers, with a towel draped over his head. The assailant, brandishing a knife in his right hand, sexually assaulted the victim several times. He then tied the victim's hands, and, after instructing her to count to 700, left through a window. The victim managed to free herself and called the police. The next day, she described the assailant to police as a white male, about five feet eight inches tall, with a medium build, dark hair, and stubbly facial hair.

While the Windsor cases are not before us on appeal, a brief summary of the evidence in those cases will be useful in assessing the defendant's claims of error. In the first Windsor case, the victim testified that she had

been sexually assaulted in her home on the evening of April 18, 1983, by a knife-wielding man whose face had been partially covered by a scarf. After the assault, the victim testified that the man had forced her inside a closet and told her to count to 300 before coming out. She described her assailant to police as a white male, about five feet eight inches tall, with dark brown eyes, thin lips and mouth and a long, thin nose. In the second Windsor case, the victim testified that on June 24, 1984, shortly after midnight, a naked white male carrying a knife had entered her bedroom and sexually assaulted her. She described her assailant to police as about five feet seven or five feet eight inches tall, of medium build, with dark hair, dark eyes and thick eyebrows.

With regard to the appeals in both the Bloomfield and South Windsor cases, the defendant claims that the trial court erred in: (1) permitting him to be tried jointly for offenses arising out of four different cases; (2) refusing to suppress the South Windsor and Bloomfield victims' pretrial and in-court identifications of him; (3) excluding from evidence the testimony of a defense expert on eyewitness identification; (4) permitting the state to impeach his alibi testimony with an inconsistent statement that he had made during the course of a court-ordered psychiatric examination; and (5) denying his posttrial motion for a new trial. In the South Windsor case, the defendant also claims that the trial court erred in refusing to suppress inculpatory statements that he made to law enforcement officers.

We agree with the defendant that the trial court erred in allowing the four cases against him to be tried jointly. We conclude, therefore, that the defendant must be afforded new, separate trials in both of the cases on appeal. This disposition makes it unnecessary for us to consider the merits of the defendant's claim that the trial court erred in denying his motion for a

new trial. We will consider the defendant's remaining claims of error to the extent that they may recur at his new trials.

I

The defendant first claims that the trial court erred in granting, over his objection, the state's pretrial motion to consolidate the four cases against him in a single trial. The trial court also denied the defendant's pretrial motion to sever the cases. At trial, the evidence in each case was heard according to the chronology in which the incidents were alleged to have occurred; the South Windsor case was tried first, and the Bloomfield case third. The state presented its case-in-chief in each case seriatim.[5] After the state had concluded its four cases-in-chief, the defendant presented his evidence in the same chronology, after which the state presented rebuttal evidence. The presentation of evidence lasted approximately ten weeks, with the first five and one-half weeks devoted entirely to the state's cases-in-chief. Before the the state commenced its case-in-chief in each of the cases, and in its final instructions to the jury, the trial court admonished the jurors that the cases against the defendant were separate and that they should not allow the evidence in one case to influence their consideration of any other.[6]

[5] After it had presented its evidence in all four cases, the state opened the Bloomfield case to present the testimony of an additional witness, and then reopened the first Windsor case to introduce an exhibit.

[6] In its final instructions the trial court told the jury that it should "keep in mind, as I've repeatedly told you, to keep the cases separate and not to use your findings in any one case as a basis for findings in any of the other cases." Later in its instructions, the court reinforced this admonition as follows:

"The Court: I will remind you that during the course of the trial certain evidence was admitted for you to consider in each of these four separate files or incidents, including exhibits and you are instructed that that particular evidence was not to be considered by you in connection with any of the other files or incidents. You will, of course, remember this and apply

The defendant claims on appeal that the joinder of the four cases was harmful to him because it permitted the jury impermissibly to aggregate the evidence in all four cases in order to convict him of the charges in the South Windsor and Bloomfield cases. The defendant also argues that the "brutal" nature of the crimes charged in the four cases "tended to arouse the passions of the jury" and interfered with its ability to consider fairly and independently the evidence in each case. The defendant claims further that the complexity of the evidence and the manner of its presentation confused the jury, enhancing the probability that it would be unable to separate the evidence in each case. We agree with the defendant that, in these circumstances, the trial court erred in permitting a joint trial.

Our General Statutes and rules of practice expressly authorize a trial court to order a defendant to be tried jointly on charges arising from separate cases. General Statutes § 54-57; Practice Book § 829.[7] The decision of whether to order severance of cases joined for trial is within the discretion of the trial court, and "the

this instruction to the evidence in each of these four cases which are being tried together, but which must be considered separately by you.

"Your verdicts on the counts in each of these four cases or incidents will be based solely on the evidence which was admitted for your consideration with respect to that particular incident or case. Where evidence was admitted on one incident but not any of the others, you must consider it only in arriving at your conclusion of guilt or innocence with respect to the incident in connection with—in connection with which it was admitted and disregard it in deciding upon the innocence or guilt of the defendant on any of the counts in any of the—on any of the counts in any of the other incidents.

"On the other hand, certain evidence introduced by the defendant, particularly relative to his mental and physical condition and characteristics and including those exhibits prefixed by the Roman numeral five, have applicability to all the incidents and counts and may so be considered by you."

[7] "[General Statutes] Sec. 54-57. JOINDER OF OFFENSES OF THE SAME CHARACTER. Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same charac-

exercise of that discretion [may] not be disturbed unless it has been manifestly abused." *State* v. *King,* 187 Conn. 292, 299, 445 A.2d 901 (1982); *State* v. *Bell,* 188 Conn. 406, 410–11, 450 A.2d 356 (1982); *State* v. *Jonas,* 169 Conn. 566, 570, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976); see Practice Book § 828.[8] It is the defendant's burden on appeal to show that the "denial of severance resulted in substantial injustice," and that any resulting prejudice was "beyond the curative power of the court's instructions." *State* v. *King,* supra, 302; *State* v. *Silver,* 139 Conn. 234, 240, 93 A.2d 154 (1952). We are convinced that this defendant has satisfied these burdens.

The gravamen of the defendant's claim is that the joinder of his cases permitted the jury to consider highly prejudicial evidence of his complicity in four different crimes in deliberating his culpability in the South Windsor and Bloomfield cases. Evidence of the defendant's guilt of one crime generally is not admissible to prove his culpability for another. See *State* v. *Jonas,* supra, 571; *State* v. *Holliday,* 159 Conn. 169, 172, 268 A.2d 368 (1970). In a joint trial, however, an omnipresent risk is that "although so much [of the evidence] as would

ter, counts for such offenses may be joined in one information unless the court orders otherwise."

"[Practice Book] Sec. 829. —TRIAL TOGETHER OF INDICTMENTS OR INFORMATIONS

"The judicial authority may, upon his own motion or the motion of any party, order that two or more indictments or informations or both, whether against the same defendant or different defendants, be tried together."

Unlike § 54-57, Practice Book § 829 does not limit joinder to cases where "offenses of the same character" are involved. *State* v. *King,* 187 Conn. 292, 296, 445 A.2d 901 (1982).

[8] "[Practice Book] Sec. 828. —SEVERANCE OF OFFENSES

"If it appears that a defendant is prejudiced by a joinder of offenses, the judicial authority may, upon his own motion or the motion of the defendant, order separate trials of the counts or provide whatever other relief justice may require."

be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all." *United States* v. *Lotsch,* 102 F.2d 35, 36 (2d Cir.), cert. denied, 307 U.S. 622, 59 S. Ct. 793, 83 L. Ed. 1500 (1939). This risk is greatly enhanced when the offenses joined are factually similar, but legally unrelated. *State* v. *King,* supra, 300; *State* v. *Jonas,* supra; *State* v. *Oliver,* 161 Conn. 348, 361, 288 A.2d 81 (1971); see *Drew* v. *United States,* 331 F.2d 85, 89 (D.C. Cir. 1964).

An exception to the rule prohibiting the substantive admission of a defendant's prior criminal offenses in the trial of another case is when " 'the collateral crime tends directly to prove the commission of the principal crime, or the existence of any element of the principal crime . . . . ' " *State* v. *Esposito,* 192 Conn. 166, 169, 471 A.2d 949 (1984); *State* v. *Williams,* 190 Conn. 104, 107, 459 A.2d 510 (1983); *State* v. *Jenkins,* 158 Conn. 149, 152–53, 256 A.2d 223 (1969). Consistent with this rule, the state may introduce evidence of other crimes to establish a defendant's intent, identity, malice, motive or system of criminal activity. See *State* v. *Williams,* supra; *State* v. *Falby,* 187 Conn. 6, 23, 444 A.2d 213 (1982).

The state concedes that if the cases against the defendant had been tried separately, evidence of the defendant's complicity in any one of the cases would not have been admissible as substantive evidence in his trials for the others. The state argues, however, that the evidence in the four cases was sufficiently distinguishable that the jury could, in accordance with the trial court's instructions, consider each case without regard to the evidence adduced in the others. We disagree.

The cases for which the defendant was jointly tried did not involve discrete, easily distinguishable factual

scenarios. Cf. *State* v. *King*, supra, 302 ("the evidence . . . was simple, separable and straightforward"); *State* v. *Oliver*, supra, 361; see also *Commonwealth* v. *Thomas*, 328 Pa. Super. 393, 400, 477 A.2d 501 (1984). Each of the four cases involved alleged sexual assaults. Except for the South Windsor case, all of the incidents occurred in adjacent towns within a few months of one another. In all four cases the alleged assailant carried a knife, and in two of the assaults the assailant was reportedly naked. In all four cases the respective victims provided similar descriptions of their assailant to police and identified the defendant as the culprit before and during trial. These factual similarities, which the state concedes were insufficient to make the evidence in each case substantively admissible at the trial of the others, were significant enough to impair the defendant's right to the jury's fair and independent consideration of the evidence in each case.

The prejudicial impact of joinder in these cases was exacerbated by the violent nature of the crimes with which the defendant was charged. Joinder gave the state the opportunity to present the jury with the intimate details of each of these offenses, an opportunity that would have been unavailable if the cases had been tried separately. We have acknowledged that evidence of a defendant's brutal or shocking conduct in one case may compromise the jury's ability to consider fairly the charges against him in other unrelated, but jointly tried cases. See *State* v. *King*, supra; *State* v. *Silver*, supra, 240–41; see generally *State* v. *Carter*, 189 Conn. 631, 644, 458 A.2d 379 (1983); *State* v. *Tinsley*, 180 Conn. 167, 171, 429 A.2d 848 (1980).

The duration and complexity of the trial also enhanced the likelihood that the jury would weigh the evidence against the defendant cumulatively, rather than independently in each case. The trial lasted approximately ten weeks. During this time, the jury

heard the testimony of approximately fifty-five witnesses, some of whom testified in more than one case, and examined some sixty-six exhibits. Under these circumstances, it was highly likely that the jury might confuse the evidence in separate cases. While jury confusion is a hazard of any long, complicated trial, its impact is especially prejudicial in a joint trial of similar, but separate cases. See *Drew* v. *United States,* supra, 91–92; *State* v. *King,* supra, 300.

The state argues that the fact that the defendant was acquitted in the Windsor cases, but convicted in the South Windsor and Bloomfield cases, shows that the jury considered the evidence in each case separately. We disagree. We can only speculate as to why the jury rendered varying conclusions as to the defendant's guilt in the four cases. It is beyond our power to probe the minds of the jurors in order to determine what considerations influenced their divergent verdicts. See *State* v. *Castonguay,* 194 Conn. 416, 437, 481 A.2d 56 (1984); *Aillon* v. *State,* 168 Conn. 541, 550–51, 363 A.2d 49 (1975). The acquittals in the Windsor cases suggest that the jury found the state's evidence in those cases insufficient to prove the defendant's guilt beyond a reasonable doubt. Those verdicts do not establish that the results in the four cases, had they been separately tried, would have been the same.

The state argues finally that the trial court's repeated admonitions to the jurors to consider separately the evidence in each case mitigated any prejudice that potentially arose from the joinder of the cases. We are unpersuaded. Although we have frequently stated that, in the absence of contrary evidence, jurors are presumed to have followed the instructions of the trial court; see, e.g., *State* v. *Moye,* 199 Conn. 389, 396, 507 A.2d 1001 (1986); we have also held that "a curative instruction is not inevitably sufficient to overcome the prejudicial impact of [inadmissible other crimes] evi-

dence." *State* v. *Tinsley,* supra, 170. In the circumstances of these cases, we conclude that even the trial court's apt and thorough admonitions could not mitigate the potential for prejudice wrought by the joinder of the cases against the defendant. Accordingly, we hold that the trial court erred in permitting the defendant's cases to be tried jointly. This conclusion requires that the defendant be granted new, separate trials in the South Windsor and Bloomfield cases.

## II

The defendant's next claim of error, applicable to both appeals, is that the trial court violated his state and federal constitutional rights to due process of law by denying his pretrial motions to suppress the victims' identifications of him as their assailant. In each case, the defendant claims that the photographic arrays from which the victims initially identified him were impermissibly suggestive. The defendant also argues that these identifications, and the victims' in-court identifications of him, were unreliable. With respect to the Bloomfield case, the defendant also challenges the admissibility of the victim's identification of him from a pretrial lineup. We find the defendant's arguments unpersuasive.

"In order to suppress evidence of an identification derived from allegedly unconstitutional procedures, a criminal defendant bears the burden of proving that the identification procedures were unnecessarily suggestive, and, if so, that the resulting identification was unreliable in the totality of the circumstances." *State* v. *Williams,* 203 Conn. 159, 173–74, 523 A.2d 1284 (1987); *State* v. *Miller,* 202 Conn. 463, 470, 522 A.2d 249 (1987). This burden requires the defendant to show that the challenged procedure " 'give[s] rise to a very substantial likelihood of irreparable misidentification.' " *State* v. *Fullwood,* 193 Conn. 238, 243–44, 476 A.2d

550 (1984); *State* v. *Ramsundar,* 204 Conn. 4, 11, 526 A.2d 1311 (1987). If the procedures used to identify the defendant were not unnecessarily suggestive, we need not independently analyze whether the identification was reliable. *State* v. *Williams,* supra; *State* v. *Miller,* supra; *State* v. *Amarillo,* 198 Conn. 285, 294, 503 A.2d 146 (1986). With these principles in mind, we will separately consider the defendant's claims of error as they relate to each case.

A

The victim in the South Windsor case viewed an array of nine photographs, including one of the defendant, on December 30, 1982. The victim selected the defendant's photograph as resembling her assailant. Although the viewing took place more than nine months after the assault, the victim said she was almost certain of her identification. The victim also identified the defendant in court as her assailant.

The presentation of an array of several photographs to witnesses, including that of the suspect, does not constitute an impermissibly suggestive pretrial identification procedure "in the absence of any unfairness or other impropriety in the conduct of the exhibit." *State* v. *Hafner,* 168 Conn. 230, 237, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975); *State* v. *Fullwood,* supra, 244; *State* v. *Wiggins,* 7 Conn. App. 95, 100–101, 507 A.2d 518 (1986). The defendant claims on appeal, however, that the array from which the South Windsor victim selected his photograph was unnecessarily suggestive because the individuals depicted possessed some physical dissimilarities and because the defendant's photograph was the only one with a dark blue background. We disagree that these differences tainted the photographic array.

"Any array composed of different individuals must necessarily contain certain differences." *State* v.

*Vaughn,* 199 Conn. 557, 564, 508 A.2d 430 (1986). Here, the defendant was depicted with other white males who appeared to be approximately his age, and whose physical traits were not so radically different from the defendant's as to make his photograph distinctive. Cf. *State* v. *Perez,* 198 Conn. 68, 74, 502 A.2d 368 (1985); *State* v. *Austin,* 195 Conn. 496, 501, 488 A.2d 1250 (1985). The varying conditions under which the individuals in the array were photographed, moreover, did not infect the procedure. Differences in the size and color composition of photographs "in and of themselves do not render an array . . . unnecessarily suggestive." *State* v. *McKnight,* 191 Conn. 564, 571, 469 A.2d 397 (1983); *State* v. *Davis,* 175 Conn. 250, 254, 397 A.2d 1347 (1978). We conclude, therefore, that the pretrial identification procedure in the South Windsor case was not impermissibly suggestive, and that the victim's pretrial and in-court identifications of the defendant were properly admitted into evidence.[9]

## B

We next consider the defendant's claims of error regarding the identifications in the Bloomfield case. On June 21, 1983, six days after the alleged assault, the victim viewed an array of eight photographs, including one of the defendant, at the Bloomfield police department. After examining the array several times, the victim set aside the defendant's photograph, but could not identify him positively as her assailant. The

---

[9] The defendant also claims that the victim's identification of him was prejudicially reinforced because the police told her, after she had identified his photograph, that he had been involved in another assault. We disagree. The victim was not aware of the defendant's complicity in another crime at the time she selected his photograph. The extent to which the information she subsequently acquired from police may have influenced her in-court identification of the defendant affected the weight to be accorded her testimony, but not its admissibility. See generally *State* v. *Williams,* 203 Conn. 159, 175 n.12, 523 A.2d 1284 (1987).

victim indicated, however, that she might be able to make a positive identification if she could observe her assailant face-to-face in a lineup.

Approximately six days after the photographic identification, Bloomfield police detective Peter Crombie arranged for the victim to listen to six tape recorded voices in an attempt to identify the voice of her assailant. The defendant's voice, which had been surreptitiously recorded from a telephone conversation, was included in the array. After listening to all of the voices twice, the victim tentatively identified the defendant's voice as that of her assailant. She was unable, however, to make a positive identification. At a pretrial hearing on the defendant's motion to suppress identifications, the trial court found that the voice array was impermissibly suggestive because the defendant's voice was dramatically different from any of the others in the array. Accordingly, the court granted the motion to suppress the voice array.

On June 30, 1983, the victim went to the Bloomfield police department to view a six person lineup. Three other sexual assault victims were at the station on the same day for the purpose of viewing the lineup. The victim viewed the lineup through a one-way mirror. As part of the procedure, each lineup participant stepped forward and recited an identical phrase: "Shut up and don't move." After observing the entire lineup, the victim asked to see two of the participants, including the defendant, again. After she had seen the defendant and the other participant alone, the victim said that she was "pretty sure" that the defendant was her assailant. She indicated, however, that she would be more certain of her identification if she could see the lineup participants without their shirts. After viewing all six participants without shirts, the victim positively identified the defendant as her assailant.

The defendant first claims that the victim's identification of his photograph was impermissibly suggestive because: (1) his photograph had a darker tone than the others in the array; (2) his photograph had no outer border, while the others did; (3) the other photographs in the array included both front and side views of the individuals depicted, while his photograph only included a front view; (4) the police placards on the photographs indicated that the defendant had been arrested more recently than the others; and (5) the defendant's photograph was one of two that were smaller than the others.

For the reasons discussed in our analysis of the defendant's claim regarding the photographic identification in the South Windsor case, we are unpersuaded that the Bloomfield procedure was impermissibly suggestive. As in the South Windsor array, the defendant was depicted among other males of his own race and approximate age. Moreover, all of the individuals in the Bloomfield array were photographed in settings that made it evident that they were or had been in police custody. The differences in the composition of the photographs did not render the defendant's depiction "so different from the other photographs as to telegraph a message to the victim that [the defendant] was the person whom the police believed guilty." *State v. Vass,* 191 Conn. 604, 611, 469 A.2d 767 (1983); *State v. Vaughn,* supra, 564–65.

Our conclusion that the photographic identification procedure was not impermissibly suggestive disposes of the defendant's additional claim that this procedure tainted the victim's subsequent identification of him from the lineup. See *State v. Amarillo,* supra, 294. The defendant's other claims of suggestiveness with respect to the lineup are that: (1) the police indicated to the victim that the individual she had selected from the photographic array would be in the lineup; (2) the victim's

tentative identification of the defendant's voice from the voice array tainted her subsequent lineup identification; (3) the victim spoke with other crime victims before the lineup, and the defendant's name came up in the conversations; and (4) the lineup identification was unreliable. We disagree.

"It may generally be said that lineups are the most useful and least questionable witness identification procedure." 1 W. LaFave & J. Israel, Criminal Procedure (1984) § 7.4 (d), p. 586. In this case, the defendant's claim is not that the lineup itself was improperly conducted, but that circumstances preceding the lineup created an atmosphere of suggestiveness that tainted the victim's identification of the defendant. The first such circumstance is that the police allegedly informed the victim that the individual she had selected in the photographic array would be a participant in the lineup. The record does not directly support this claim. Detective Crombie, who conducted the photographic identification procedure, testified that to his knowledge the victim had not been informed that the person whose photograph she had identified would be a suspect in the array. The victim testified, however, that she had assumed that the person whose photograph she had identified would be in the lineup. This assumption was one which would naturally arise under the circumstances, and, in itself, did not render the lineup identification impermissibly suggestive. See *State* v. *Williams,* supra, 177; *State* v. *Fullwood,* supra, 245; see also *United States* v. *Carter,* 756 F.2d 3103 (3d Cir. 1985). The victim testified, moreover, that the person she had identified in the lineup looked different from the person depicted in the photograph, an assertion that the record verifies. This testimony undercuts the defendant's claim that the victim's identification of him in the lineup was the product of her earlier photographic identification. See *State* v. *Miller,* supra, 473.

The defendant next argues that the victim's identification of his voice before viewing the lineup rendered the lineup identification suggestive. We disagree. The record indicates that the defendant's voice was not a significant criterion in the victim's identification. Despite the suggestive nature of the voice array, the victim made only a tentative identification based on that procedure. She was not told that the voice she had identified was that of the person whose photograph she had previously selected. The victim testified, moreover, that hearing the voices of the lineup participants had not helped her to identify the defendant. Rather, she said, it was the defendant's physical characteristics, particularly his facial features and protruding collarbone, that had enabled her to identify him from the lineup. This testimony is corroborated by the fact that, although the victim heard the voices of each of the lineup participants several times, she was unable to make a positive identification until she had seen the participants without their shirts. We conclude, therefore, that the defendant has failed to meet his burden of showing that the voice identification rendered the lineup impermissibly suggestive.

The defendant next claims that the lineup identification was tainted because the victim talked with other sexual assault victims, including the victim in one of the Windsor cases, prior to viewing the lineup. A brief recitation of the facts underlying this claim is appropriate. The Bloomfield victim was one of four sexual assault victims who came to the Bloomfield police department on June 30, 1983, to view the lineup. She testified that she had been placed in a single room with the three other victims before viewing the lineup.[10] The victims had spoken to one another. The defendant's name had come up in the conversation, and he had been

---

[10] Bloomfield police detective Peter Crombie testified that the victims had been segregated before viewing the lineup. Two other witnesses, how-

referred to as a possible suspect. One of the other victims said that she had known the defendant in high school. The victim testified, however, that she had not discussed the defendant's physical features, speech or other identifying characteristics with the other victims.

The defendant argues that the pre-lineup conversation between the victims encouraged the Bloomfield victim to focus on him as her likely assailant. We disagree. It is true that the Bloomfield police's failure to sequester the victims invited the possibility of an exchange of information that might taint any subsequent identification. On this record, however, there is no evidence that this possibility materialized. All that the victim gleaned from her conversation with the other victims was that a man named James Boscarino, a possible suspect in her case, was one of the participants in the array she was about to view. There is nothing in the record to suggest that she obtained information that aided her in distinguishing the defendant from the other participants in the lineup. The fact that the victim required repeated viewings of the lineup before she was able to make a positive identification militates against the defendant's claim that her contact with the other victims helped her to single him out from the other participants. We conclude, therefore, that the defendant has not met his burden of proving that the victim's pre-lineup conversations rendered the subsequent identification procedure impermissibly suggestive.

---

ever, confirmed the Bloomfield victim's testimony that she and the other victims had been placed in the same room before the lineup.

Evidence was also adduced at the suppression hearing that the Bloomfield victim had spoken with another sexual assault victim on the day that the voice array was conducted. There is no evidence, however, that the two victims exchanged information regarding the physical descriptions of their respective assailants.

## III

The defendant's third claim of error, applicable to both appeals, is that the trial court erred in sustaining the state's objection to the testimony of Robert Buckhout, a professor of psychology whom the defendant sought to introduce as an expert witness on the reliability of eyewitness identifications. Buckhout testified, in the course of a defense offer of proof, that eyewitness identifications, especially in stressful situations, are often inaccurate. He also testified that the possibility of inaccurate identifications may be enhanced if the witness is shown photographic arrays and lineups. The trial court refused to allow Buckhout to testify before the jury. The court reasoned that Buckhout's testimony would not materially aid the jurors in assessing the reliability of the identifications. The defendant took exception to the trial court's ruling. On appeal, he claims that this ruling was an evidentiary error that deprived him of his state and federal constitutional rights to present witnesses in his defense. U.S. Const., amends. VI, XIV; Conn. Const., amend. XVII. We disagree.

The defendant's claim of error is governed by our recent opinion in *State* v. *Kemp,* 199 Conn. 473, 475–79, 507 A.2d 1387 (1986). In *Kemp,* we considered a virtually identical defense claim challenging the exclusion of the testimony of the same expert as the defendant proffered in this case. We held that expert testimony on eyewitness identifications " 'invades the province of the jury to determine what weight or effect it wishes to give to eyewitness testimony.' " Id., 477. We also noted that such testimony is ordinarily superfluous, since "[t]he weaknesses of identifications can be explored on cross-examination and during counsel's final arguments to the jury." Id., 478. For these reasons, we conclude that the trial court's exclusion of

Buckhout's testimony in these cases was proper, both from an evidentiary and a constitutional standpoint.

## IV

The defendant's next claim of error pertaining to both appeals is that the trial court erred in permitting the state to impeach him on cross-examination with a statement that he had made in the course of a court-ordered psychiatric evaluation. The defendant argues that the state's use of the statement violated § 760 of the Practice Book, which provides in relevant part: "No statement made by the defendant in the course of any [court-ordered psychiatric examination] . . . shall be admitted in evidence against the defendant *on the issue of guilt* in any criminal proceeding."[11] (Emphasis added.) We agree with the defendant that the trial court erred in permitting the state to impeach him with the challenged statement on cross-examination.[12]

---

[11] "[Practice Book] Sec. 760. —— ——PSYCHIATRIC EXAMINATION

"In an appropriate case the judicial authority may, upon motion of the prosecuting authority, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the defendant in the course of any examination provided for by Sec. 757, whether the examination shall be with or without the consent of the defendant, shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding. A copy of the report of the psychiatric examination shall be furnished to the defendant within a reasonable time after the examination."

[12] The error claimed by the defendant arose during the second Windsor case, in which the defendant was acquitted. Concededly, therefore, the error will not recur at the defendant's new trials in the same context as it arose at his first trial. We note, however, that the defendant's mental condition may well be an issue at his new trials, and, accordingly, the state may seek again to introduce evidence of the results of a court-ordered psychiatric evaluation of the defendant. It is reasonably likely, therefore, that the issue now raised on appeal will recur at the new trials, albeit under different circumstances than at the first trial. For this reason, and because of the issue's importance, we will review the defendant's claim of error. See *State v. Fritz,* 204 Conn. 156, 166, 527 A.2d 1157 (1987); see generally *Riccio v. Abate,* 176 Conn. 415, 418 n.1, 407 A.2d 1005 (1979); *Scott v. General Iron & Welding Co.,* 171 Conn. 132, 139, 368 A.2d 111 (1976).

The facts underlying this claim of error are as follows. Near the end of its case-in-chief in the Bloomfield case, the state moved the trial court, pursuant to Practice Book § 760, to require the defendant to submit to a psychiatric examination. Previously, the defendant had given notice of his intention to introduce at trial expert testimony relating to his mental state. The trial court ruled that the defendant's mental state was an issue properly before the jury and, over the defendant's objection, granted the state's motion for a compulsory examination. Dr. Donald R. Grayson, a psychiatrist selected by the state, examined the defendant on June 15, 1984.

During the presentation of his defense in the second of the two Windsor cases, the defendant offered the testimony of his mother, and a woman who had allegedly been on a date with him on the night of June 23, 1983, that he had arrived at his home in Windsor that night at approximately 11:45 p.m., about 45 minutes before the second Windsor assault allegedly had occurred. The defendant's mother testified that she had seen him "in his pajamas, ready for bed" at approximately 12:25 a.m. the following morning, a time approximately contemporaneous with the alleged assault. The defendant, testifying on his own behalf, confirmed that he had arrived home on June 23 at approximately 11:45 p.m. On cross-examination, however, the trial court, over the defendant's objection, permitted the state to ask the defendant whether, during the psychiatric examination, he had told Grayson that he had arrived home at 12:15 a.m. on the date of the second Windsor assault. The defendant responded in the affirmative. At the conclusion of the defendant's testimony, the trial court instructed the jury that it should consider evidence of the defendant's inconsistent statement to Grayson as bearing on the defendant's credibility, but not to prove the substantive matter of the crimes alleged.

On appeal, the defendant argues that the state's use of his statement to Grayson, to undermine the veracity of his account of his activities on the night of the second Windsor assault, violated Practice Book § 760 because the statement bore directly on "the issue of guilt." By contrast, the state argues that the statement related only to the defendant's credibility, and that the state properly used it in cross-examination notwithstanding Practice Book § 760. We disagree with the state's argument.

Section 760 of our Practice Book effects a compromise between the defendant's right to avoid self-incrimination and the state's right to procure and present evidence of the defendant's mental state when such evidence is relevant to an issue at trial. See generally *State* v. *Lovelace,* 191 Conn. 545, 551–52, 469 A.2d 391 (1983), cert. denied, 465 U.S. 1107, 104 S. Ct. 1613, 80 L. Ed. 2d 142 (1984). In order to safeguard the rights of criminal defendants to due process of law, § 760 must be "strictly construed to protect the fundamental constitutional right to liberty." *State* v. *Cook,* 183 Conn. 520, 522, 441 A.2d 41 (1981); *State* v. *Shockley,* 188 Conn. 697, 711, 453 A.2d 441 (1982); *State* v. *Schaeffer,* 5 Conn. App. 378, 382, 498 A.2d 134 (1985).

We agree with the defendant that the state's use of his statement to Grayson implicated the issue of his guilt, by discrediting his alibi in particular and his veracity in general. "The purpose of impeachment is to undermine the credibility of a witness so that the trier will disbelieve him and disregard his testimony." *State* v. *Maldonado,* 193 Conn. 350, 362, 478 A.2d 581 (1984). The jury's assessments of the defendant's credibility, and that of the witnesses in his defense, were crucial to its ultimate determinations of the defendant's guilt or innocence. See *State* v. *Smith,* 200 Conn. 544, 550, 512 A.2d 884 (1986). We conclude, therefore, that the state's use of the statement made by the defendant in

the court-ordered psychiatric examination violated § 760, and that the trial court erred in permitting the statement to be used on cross-examination.

The state argues finally that any error precipitated by its use of the defendant's statement is "irrelevant" to these appeals because the defendant was acquitted in the second Windsor case. We disagree. Because the four cases against the defendant were erroneously joined for trial, it was substantially likely that the state's improper impeachment of the defendant in the second Windsor case negatively influenced the jury's perception of his credibility in the other cases, including the South Windsor and Bloomfield cases. See *State* v. *Oliver,* 161 Conn. 348, 361–62, 288 A.2d 81 (1971). We therefore reject the state's argument that the trial court's error in this regard was "irrelevant" and "academic."

V

The defendant's final claim of error pertains only to the South Windsor case. The defendant argues that the trial court violated his state and federal constitutional rights to due process of law by refusing to suppress certain incriminating admissions that he made to South Windsor police. The defendant claims that: (1) the admissions were involuntary; and (2) he did not knowingly and intelligently waive the rights afforded him under *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), before submitting to police interrogation. The defendant will have an additional opportunity to pursue these arguments at his new trial in the South Windsor case. See *State* v. *Burge,* 195 Conn. 232, 249, 487 A.2d 532 (1985). On the record before us, however, we conclude that the trial court did not err in allowing the defendant's incriminating statements to be admitted into evidence at his trial.

The following facts are relevant to our consideration of the defendant's claims. On the morning of December 30, 1982, South Windsor police arrested the defendant in connection with an assault that had occurred the previous day at a doughnut shop (the doughnut shop incident). The arrest took place in a parking lot where a police officer, posing as the victim in the doughnut shop incident, had arranged to meet the defendant. At the time of his arrest the police orally advised the defendant of his *Miranda* rights. The defendant said that he understood those rights. Upon arriving at police headquarters, the defendant was again advised of his *Miranda* rights. The defendant signed a form acknowledging that he had been so advised and that he understood his rights. Fifteen minutes later the defendant executed a written waiver of his *Miranda* rights. The defendant did not request an attorney or indicate his unwillingness to talk to the police at that time.

At approximately 10:30 a.m., after the defendant had executed the written waiver, Detective Francis J. Felber questioned him regarding the doughnut shop incident. This questioning lasted about fifteen minutes. Felber then began questioning the defendant on the South Windsor case, because, Felber testified, the defendant appeared to fit the description of the assailant in that case. Felber interrogated the defendant intermittently over the next three hours regarding the South Windsor case. Detective Sergeant Edward Kasheta, Jr., also participated in the interrogation. The defendant made no incriminating statements during this period.

At approximately 2 p.m., Felber turned over the defendant to Officer Roberta Raffa for processing in connection with his arrest in the doughnut shop incident. Raffa did not attempt to interrogate the defendant, and reminded him of his rights to remain silent and to consult an attorney. The defendant indicated

that he understood and said that he did not want to contact an attorney. A few minutes later, Felber called Raffa into another room. When Raffa returned shortly thereafter, the defendant, without prompting, said, "I know I'm going to get blamed for [the South Windsor assault]."

While the defendant was being processed, Felber left the station to participate in a photographic identification session with the victim in the South Windsor case. When he returned to the station about 3:30 p.m., he again asked the defendant whether he had been involved in that assault. The defendant denied that he had. Felber then told the defendant that the victim in the South Windsor case had identified him as her assailant from a photographic array. A few minutes later, the defendant said that he "could have" been the perpetrator of the South Windsor assault. At this point his interrogation ceased.

Although the defendant remained in police custody overnight, he was not interrogated again until the following morning, when Felber and Kasheta drove him to the courthouse in Manchester to be arraigned in connection with the doughnut shop incident. During the trip to the courthouse, the defendant again indicated that he could have committed the South Windsor assault. Pressed by the two officers to admit or deny his complicity in that assault, the defendant admitted that he had been the perpetrator.

## A

The defendant's first claim is that his incriminating admissions were involuntary. In support of this claim, he argues that: (1) his two day interrogation was coercive and intimidating; (2) the police intentionally delayed his arraignment in order to procure his confession; and (3) he was a weak-willed person who, under

the pressure of sustained interrogation, would be likely to admit his complicity in the case in order to satisfy the police. We are unpersuaded.

The use of an involuntary confession in a criminal trial violates due process of law. *State v. Smith,* 200 Conn. 465, 475, 512 A.2d 189 (1986); *State v. Shifflett,* 199 Conn. 718, 727, 508 A.2d 748 (1986). The trial court must determine the voluntariness of a confession based on the totality of the circumstances. *State v. Smith,* supra, 477; *State v. DeAngelis,* 200 Conn. 224, 235, 511 A.2d 310 (1986); *State v. Falby,* 187 Conn. 6, 16, 444 A.2d 213 (1982). In this determination, the central criterion is whether police conduct "was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . " *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961); *State v. Smith,* supra; *State v. Shifflett,* supra.

The record does not support the defendant's claim that his incriminating admissions were the product of police coercion. There is no evidence that the police officers who interviewed the defendant induced his admissions with threats or promises, or subjected him to protracted periods of grueling interrogation. Cf. *Culombe v. Connecticut,* 367 U.S. 568, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961). To the contrary, although the defendant was in police custody for almost twenty-four hours following his arrest on December 30, 1982, police questioned him only sporadically regarding the South Windsor case, for a period totalling approximately four hours. The police gave the defendant food and allowed him access to a telephone. That evening, they informed him that his parents had come down to the station and that an attorney would be available to represent him in court the following day. Moreover, the defendant was repeatedly advised of his *Miranda* rights, including his rights to remain silent and to consult an attorney. On

each occasion, the defendant indicated that he understood those rights. There is no evidence, on this record, that the police "exerted such coercive pressures against the defendant as to violate due process in their efforts to obtain his confession." *State* v. *Shifflett,* supra, 729–30.

The defendant claims that the police intentionally delayed his arraignment in order to obtain his confession in the South Windsor case. Again, the record does not support this claim. At the hearing on the defendant's motion to suppress, the trial court found that the defendant had been arrested too late in the morning of December 30 to schedule an arraignment on the same day. Such scheduling was unfeasible because, at the time, the courts were on a holiday schedule that permitted morning arraignments only. The trial court's finding was supported by police testimony adduced at the suppression hearing. The trial court could properly have given credit to this testimony, which the defendant did not refute. See *State* v. *Perry,* 195 Conn. 505, 516 n.8, 488 A.2d 1256 (1985).

The defendant also claims that his psychological characteristics rendered him uniquely susceptible to "pressure" from police to admit his complicity in the South Windsor case. At the suppression hearing, a defense psychiatrist, Dr. John H. Felber, testified that the defendant had an "extremely low" tolerance for stress and might give false answers in order to satisfy the expectations of his questioners and thereby "escape" a stressful situation. In rejecting Dr. Felber's testimony, the trial court noted that the defendant's demeanor while testifying at the suppression hearing did not suggest the existence of any mental defects that could affect his capacity to make a voluntary confession. The trial court also noted that Dr. Felber had not had the opportunity to observe the defendant in police

custody. As Dr. Felber conceded, his evaluation had been based exclusively on a three and one-half hour interview with the defendant.

The weight to be accorded Dr. Felber's testimony was for the trial court to determine. See *State* v. *Perry,* supra; *State* v. *Gordon,* 185 Conn. 402, 409, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982); *State* v. *Perez,* 182 Conn. 603, 610, 438 A.2d 1149 (1981). Notwithstanding Dr. Felber's opinion, the court could properly consider the defendant's demeanor at the suppression hearing, and evidence of his conduct during the police interrogation, as demonstrating his ability to make a voluntary confession. See *State* v. *Shifflett,* supra; *State* v. *Jones,* 193 Conn. 70, 84–85, 475 A.2d 1087 (1984). Although on the present record it appears that the state introduced sufficient evidence to meet its burden of proof on the issue of voluntariness, "on remand the defendant should have the opportunity to reargue the extent to which his impaired mental capacity affected the validity of his confession." *State* v. *Burge,* supra.[13]

---

[13] In *State* v. *Mayette,* 204 Conn. 571, 529 A.2d 673 (1987), we considered, in another context, the circumstances surrounding the defendant's incriminating admissions to police on December 30 and 31, 1982. At issue in *Mayette* was the admissibility of the defendant's confession to a sexual assault unrelated to these appeals. Another individual, Mayette, was ultimately charged and found guilty of this offense. The defendant confessed to the unrelated sexual assault to Detective Francis Felber and Detective Sergeant Edward Kasheta, Jr., on December 31, during the same automobile trip in which he admitted his complicity in the South Windsor case. Mayette sought to admit the defendant's confession into evidence at his trial as a third party declaration against penal interest. The focal point of our inquiry in *Mayette* was not whether the defendant's confession was voluntary, but whether it satisfied established criteria of trustworthiness and corroboration so as to justify its admission as exculpatory evidence at Mayette's trial. Our conclusion in *Mayette* that the defendant's confession did not satisfy these criteria is, therefore, not inconsistent with our conclusion in this case that the defendant's incriminating admissions in the South Windsor case were made voluntarily.

At the evidentiary hearing on the admissibility of the defendant's confession in the *Mayette* trial, Kasheta testified that on December 31, the day

B

The defendant next claims that the trial court should have suppressed his incriminating admissions because the police failed to obtain a knowing and intelligent waiver of his *Miranda* rights. Specifically, he argues that: (1) he was mentally incompetent to waive his rights knowingly and intelligently; and (2) the *Miranda* warnings that he received, and acknowledged that he had understood, were valid only as to the doughnut shop incident and not the South Windsor case. We are unpersuaded.

The state has the burden of proving by a preponderance of the evidence that the defendant knowingly and intelligently waived his *Miranda* rights. *State* v. *Hernandez,* 204 Conn. 377, 395, 528 A.2d 794 (1987); *State* v. *Chung,* 202 Conn. 39, 48, 519 A.2d 1175 (1987); *State* v. *Toste,* 198 Conn. 573, 579–80, 504 A.2d 1036 (1986). The waiver must be made voluntarily, and "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran* v. *Burbine,* 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). Whether a purported waiver satisfies these requirements is a question of fact in which the circumstances of the particular case, including the record of the defendant's conduct in police custody, should be considered. *State* v. *Hernandez,* supra; *State* v. *Chung,* supra, 51; *State* v. *Pecoraro,* 198 Conn. 203, 208–209, 502 A.2d 396 (1985).

the defendant confessed both to the sexual assault with which Mayette was ultimately convicted and to the South Windsor assault, the defendant "would have told us he stole the Brooklyn Bridge, if we would have asked." *State* v. *Mayette,* supra, 575. Because this statement is not part of the record on these appeals, we do not consider what weight, if any, it bears in the factual determination of whether the defendant voluntarily incriminated himself in the South Windsor case. At his new trial, however, the defendant will have the opportunity to adduce additional evidence on the issue of voluntariness.

The defendant's competency is also a relevant factor, because it bears upon "his ability to understand and act upon his constitutional rights." *State* v. *Toste,* supra, 580; *State* v. *Hernandez,* supra, 396.

In support of his argument that he was incompetent to waive his *Miranda* rights, the defendant again cites the testimony of Dr. Felber. Dr. Felber testified: that the defendant had a low I.Q.; that his ability to formulate abstract concepts, and thereby make judgments as to the consequences of his conduct, was "practically nil"; and that even if the defendant had been advised of his *Miranda* rights and had read them himself, he would have been unable to understand those rights. We disagree, however, that Dr. Felber's testimony was necessarily conclusive on the issue of the defendant's competency. We note that the defendant had completed high school, albeit with the aid of special tutoring, and had taken some college courses. The record of his conduct in police custody shows that, while he appeared nervous at times, he did not appear confused or disoriented. As the trial court noted, his responses to questions posed at the suppression hearing were coherent and lucid. At that hearing the defendant admitted that he had been read, and had acknowledged his understanding of, his *Miranda* rights. He admitted that he had executed a written waiver of those rights, which, in itself, is "strong proof" of the validity of his waiver. *North Carolina* v. *Butler,* 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *State* v. *Chung,* supra, 50–51. The defendant denied, moreover, that the police had coerced him into talking with threats or promises. Cf. *State* v. *Shifflett,* supra, 731. On this record, we conclude that the trial court did not err in finding that the defendant was competent to waive his *Miranda* rights knowingly and intelligently. See *State* v. *DeAngelis,* supra, 235; *State* v. *Toste,* supra, 581; see generally

*State* v. *Simms,* 201 Conn. 395, 414, 518 A.2d 35 (1986).[14]

The defendant next claims that he did not knowingly and intelligently waive his *Miranda* rights with respect to the South Windsor case because at the time that the police advised him of his rights, he was unaware that he was a possible suspect in that case. Accordingly, the defendant argues, he was not fully aware of the consequences of waiving his rights. We are unpersuaded.

"It is clear that the guidelines of *Miranda* do not, per se, limit police interrogation to the crime with which a suspect has been explicitly charged. Ordinarily, *Miranda* warnings permit the police to extend their questioning of one who is in custody to include crimes other than the very case under investigation." *State* v. *Falby,* supra, 14; see *Michigan* v. *Mosley,* 423 U.S. 96, 104–105, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975); 1 W. LaFave & J. Israel, Criminal Procedure (1984) § 6.8 (d). If police intentionally mislead a suspect as to the purpose of interrogation, as by asking questions about one crime in order to secure damaging admissions regarding another, the suspect may be deprived of information needed to appreciate the significance of waiving *Miranda* rights. See *State* v. *Falby,* supra,

[14] Although the state did not present its own evidence of the defendant's mental condition at the suppression hearing, at trial Dr. Donald R. Grayson, who examined the defendant in a court-ordered psychiatric evaluation, contradicted Dr. Felber's testimony in several key respects. In particular, Grayson testified that the defendant's capacity for reason and abstract conceptualization appeared to be "intact." Grayson also testified that the defendant demonstrated "reasonable judgment and foresight." In determining whether the state has met its burden of proving a valid waiver of *Miranda* rights, we "review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling admitting the statements was made." *State* v. *Toste,* 198 Conn. 573, 576, 504 A.2d 1036 (1986); *State* v. *Shifflett,* 199 Conn. 718, 729, 508 A.2d 748 (1986). We conclude, therefore, that Grayson's testimony lends additional support to the validity of the trial court's finding that the defendant knowingly and intelligently waived his *Miranda* rights.

15; see generally *State* v. *Derrico,* 181 Conn. 151, 163, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 6 L. Ed. 2d 607 (1980). In this case, however, there is absolutely no evidence that the police used the defendant's arrest in ⁺he doughnut shop incident as a pretext to interrogate him on the South Windsor case. The police questioned him separately on the two cases. Interrogation on the South Windsor case began less than one hour after the defendant had been advised of his *Miranda* rights and had waived those rights in writing. The police reminded the defendant of his *Miranda* rights at least three times after it became clear that the focus of their inquiry had shifted to the South Windsor case. Cf. *State* v. *Burge,* supra, 248. The record simply does not support the defendant's claim that he was unaware of the consequences of his waiver. We conclude, therefore, that the trial court did not err in refusing to suppress the defendant's incriminating admissions.

There is error in both cases, the judgments are set aside and a new trial is ordered in both.

In this opinion the other justices concurred.