******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DEVON D.*
(AC 35400)

Bear, Keller and Pellegrino, Js.**

*Argued February 20—officially released May 27, 2014*

(Appeal from Superior Court, judicial district of
Hartford, Carbonneau, J.)

*James B. Streeto*, assistant public defender, with

whom, on the brief, was *Heather M. Wood*, assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anne Mahoney*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Devon D., appeals from the judgments of conviction, rendered after a jury trial, of eleven offenses, in three separate files with three different docket numbers, pursuant to three separate informations, involving three different victims. Specifically, the defendant appeals from the following judgments of conviction: In docket number CR-10-642409, one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1), and one count of risk of injury to a child in violation of § 53-21 (a) (2); in docket number CR-10-642410, two counts of sexual assault in the first degree in violation of § 53a-70 (a) (2), one count of risk of injury to a child in violation of § 53-21 (a) (1), and two counts of risk of injury to a child in violation of § 53-21 (a) (2); and, in docket number CR-10-643139, one count of sexual assault in the first degree in violation of § 53a-70 (a) (2), one count of risk of injury to a child in violation of § 53-21 (a) (1), and one count of risk of injury to a child in violation of § 53-21 (a) (2). On appeal, the defendant claims: (1) his rights to a fair trial and an impartial jury were violated by the court's denial of his motion to sever the three separate informations, which had been joined for a single trial, and (2) the court improperly permitted the state to use a dog to comfort one of the victims while she testified. We reverse the judgments of conviction and remand the cases for new trials.

The following facts, which reasonably could have been found by the jury, and procedural history inform our review. The defendant and his former girlfriend (GF) have several children together, including C1, C2 and C3. After the defendant and GF ended their relationship and separated in 2005, the children visited him at his residence, which they called the "white house," or at the home of the defendant's mother, where he was a frequent visitor. The defendant then moved to an apartment, where he resided with a male roommate for approximately one and one-half to two years. The children also visited with the defendant at that apartment. The defendant and GF did not have a good relationship with each other, and they fought frequently. GF complained that the defendant was violent toward her, that he failed to support the children, and that he frequently violated the terms of a restraining order that she had obtained against him. GF also admitted that the defendant had filed motions for contempt against her for interfering with his visitation rights.

While trick-or-treating in October, 2009, six year old C1, who was the daughter of GF and the defendant, told GF that the defendant had sexually abused her by putting his "wee-wee" on her stomach and by touching her "private" part with his fingers. They talked about

these allegations again the next morning. Several days later, GF told Frieda Griffin, a social worker with the Department of Children and Families (department), about C1's allegations. Griffin had been working with the family and had been going to GF's home on a regular basis. GF then contacted the police, and she brought C1 to Saint Francis Hospital and Medical Center, where C1 participated in two videotaped interviews conducted, on different days, by Erin Byrne, a clinical child interview specialist for the Children's Advocacy Center at Saint Francis Hospital and Medical Center. C1 told Byrne that the defendant had penetrated her "private" with his fingers and with his penis, which hurt and caused her to bleed, that he attempted to penetrate her "butt" with his penis, that he ejaculated on her several times, and that he forced her and her siblings to watch a pornographic movie. She also told Byrne that the defendant forced her to perform fellatio on him, but she vomited when he ejaculated in her mouth. Additionally, C1 told Byrne that the defendant was upset because she had eaten meat, so he put vinegar in her "privates" and in her ears; he also tried to insert his penis into her ear to clean her flesh and get the "meat" she had eaten out of her body, thus causing her ear to bleed. C1 also told Byrne that the defendant had his clothes off or his pants pulled down during these instances and that many of them occurred in the bedroom.[1]

In November, 2009, eight year old C2, who was the son of the defendant and GF, revealed that the defendant had sexually abused him by inserting a rag covered finger into his "butt hole" while he was bathing. C2 then was interviewed at school by Yolanda Napper, an investigative social worker with the department. C2 also participated in a videotaped interview with Stacy Karpowitz, who then was a child forensic interview specialist with the Children's Advocacy Center. C2 reiterated his allegations to Karpowitz and also told her that the defendant had scrubbed his penis on several occasions when he bathed C2, but that the defendant always had on his clothes and had never asked C2 to touch him inappropriately. C2 also stated that the defendant made him and some of his siblings watch a pornographic movie, and had warned him not to say anything.[2]

Also in November, 2009, after learning that his sister had disclosed the sexual abuse committed by the defendant, ten year old C3, another son of GF and the defendant, disclosed to GF that the defendant also had abused him. C3 was interviewed at school by Napper, and he then was taken to Saint Francis Hospital and Medical Center, where he participated in a videotaped interview with Lisa Murphy-Cipolla, a clinical child interview supervisor with the Children's Advocacy Center. C3 told Murphy-Cipolla that the defendant had inserted a rag covered finger into his "butt" and scrubbed his penis, attempting to pull back his foreskin,

on several occasions while C3 bathed, and that it was painful and the soap burned. He also stated that, although the defendant sometimes had him shower with C2, he did not see the defendant do anything to C2. Also, when Murphy-Cipolla asked C3 if the defendant had attempted to have him do anything to the defendant, C3 said no. C3 also told Murphy-Cipolla that he had witnessed the defendant insert his finger into the "butt" of C1 while she showered, and had made him and his siblings watch a pornographic movie in his bedroom while he was in the kitchen. During his testimony before the jury, C3 stated that what the defendant had done was "not even that serious," but that "[it was] negative." He explained that the defendant "washes us, like, in our privates . . . [and] he stick[s] his finger in our butt . . . ."[3]

C1, C2 and C3 also underwent physical examinations for sexual abuse, but no physical evidence of abuse was found. C1 did have some redness around her urethra, but her hymen was intact, and Audrey Courtney, the nurse practitioner, who had examined her, stated that she found no evidence that C1 had been sexually abused. Courtney also found no anal abnormalities on C2, but did find that he had a condition, called phimosis, that prevented his foreskin from retracting, which was not caused by sexual abuse. Courtney also testified that the lack of physical evidence was not uncommon even when a child had been the victim of sexual abuse.

The defendant, although opting not to testify, defended the cases on the theory that there was no sexual abuse and that GF had contrived the abuse allegations to stop him from seeing the children. Defense counsel brought out the fact that the defendant and GF did not get along, that GF had a restraining order against the defendant, and that the defendant had filed motions for contempt against GF for interfering with his visitation rights. Additionally, during the questioning of C2, defense counsel asked him if there was a time that his mother was not bathing him enough, and he responded that he did not remember. During the questioning of C3, defense counsel asked C3 whether he had poor hygiene and asked him whether Griffin was assisting the family, in part, because of the children's hygiene. C3 stated that he did not know. Additionally, the children had alleged that some of the abuse occurred when the defendant took them to the home of his mother, and that she frequently was in the home when this occurred. The defendant's mother testified that, because of her places of employment, she is a mandatory reporter. She stated that the children's home was not clean and the children were not clean. She testified that they sometimes were "[d]irty, smelly, their hair is not clean." She also stated that the defendant would take the children to her home only when she was there and that he did bathe the children there, but that she never saw any type of abuse and that she "would never

put up with that."

Following a trial by jury, the defendant, on July 19, 2011, was found guilty of all charges in all three informations. The defendant filed motions for acquittal in each case, as well as motions for a new trial. The court denied the defendant's motions and sentenced him to a total effective term of forty years imprisonment, execution suspended after eighteen years, with thirty-five years of probation thereafter. This appeal followed. Additional facts will be set forth as necessary.

I

On appeal, the defendant claims that his rights to a fair trial and an impartial jury were violated by the denial of his motion to sever the three separate informations, involving three different victims. He argues that the evidence from C1's case was not cross admissible in the cases of C2 and C3 and that, under the factors articulated in *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987), his motion to sever should have been granted, and the cases should have been tried separately. We conclude that the evidence in C1's case was not cross admissible in the other cases involving C2 and C3, that the evidence in the cases involving C2 and C3 was not cross admissible in the case involving C1, that the denial of severance resulted in substantial prejudice, and that any resulting prejudice was beyond the curative power of the court's instructions.

The following additional facts are relevant to our analysis. The defendant filed a motion for severance on March 29, 2011, arguing that he would suffer substantial prejudice if the cases were not severed. Before the trial court, the state argued that the *Boscarino* factors; see id., 722–24; weighed in favor of the state, and it also argued that the evidence from each case was cross admissible in the other cases because it fit under the common scheme or plan exception to the rule against hearsay. The state also briefly mentioned *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008), but offered no argument specifically regarding propensity. The defendant responded that the facts alleged in the case involving C1 were vastly different from the facts alleged in the cases involving C2 and C3, and that, therefore, it was unlikely that the court would allow this evidence to be introduced under the common scheme or plan exception if the cases were severed. The court, applying the presumption in favor of joinder that had been considered proper prior to *State* v. *Payne*, 303 Conn. 538, 34 A.3d 370 (2012), determined that severance was not required under the *Boscarino* factors and that it would be easier for the children if the cases were joined;[4] it did not opine at that time on whether it considered the evidence to be cross admissible.[5]

On appeal, the defendant argues that this case is controlled by *State* v. *Gupta*, 297 Conn. 211, 222–34,

998 A.2d 1085 (2010), and that the evidence from each case was neither cross admissible, nor admissible under the *Boscarino* factors. Accordingly, he argues, the court improperly denied his motion for severance. We agree that the evidence from C1's case was not cross admissible in the cases involving C2 and C3, and that the evidence in the cases involving C2 and C3 was not cross admissible in the case involving C1.

On appeal, "[i]t is the defendant's burden . . . to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . . . [I]n deciding whether to [join informations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb." (Citation omitted; internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 158, 51 A.3d 1048 (2012).

"[I]n considering whether joinder is proper, this court has recognized that, where evidence of one incident would be admissible at the trial of the other incident, separate trials would provide the defendant no significant benefit. . . . Under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. . . . Accordingly, we have found joinder to be proper where the evidence of other crimes or uncharged misconduct [was] cross admissible at separate trials. . . . Where evidence is cross admissible, therefore, our inquiry ends.

"Substantial prejudice does not necessarily result from [joinder] even [if the] evidence of one offense would not have been admissible at a separate trial involving the second offense. . . . Consolidation under such circumstances, however, may expose the defendant to potential prejudice for three reasons: First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all. . . .

"[Accordingly, the] court's discretion regarding joinder . . . is not unlimited; rather, that discretion must be exercised in a manner consistent with the defendant's right to a fair trial. Consequently, [in *State* v. *Boscarino*, supra, 204 Conn. 722–24] we have identified

several factors that a trial court should consider in deciding whether a severance [or denial of joinder] may be necessary to avoid undue prejudice resulting from consolidation of multiple charges for trial. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 155–56.

In this case, on the basis of our review of the record, we are persuaded that under *DeJesus* and *Boscarino*, the evidence from the case involving C1 was not cross admissible in the cases involving C2 and C3, and the evidence from the cases involving C2 and C3 was not cross admissible in the case involving C1.[6] Accordingly, we conclude that the trial court abused its discretion in denying the defendant's motion for severance.

A

Cross Admissibility

In *State* v. *DeJesus*, supra, 288 Conn. 470–74, our Supreme Court concluded "that evidence of uncharged sexual misconduct is admissible only if it is relevant to prove that [a] defendant had a propensity or a tendency to engage in the type of aberrant and compulsive criminal sexual behavior with which he or she [was] charged. Relevancy is established by satisfying the liberal standard pursuant to which [prior sex crimes] evidence previously was admitted under the common scheme or plan exception. Accordingly, evidence of uncharged misconduct [or other crimes] is relevant to prove that [a] defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed [against] persons similar to the prosecuting witness.

"[Such] [e]vidence . . . is admissible only if its probative value outweighs the prejudicial effect that invariably flows from its admission. . . . In balancing the probative value of such evidence against its prejudicial effect, however, trial courts must be mindful of the purpose for which the evidence is to be admitted, namely, to permit the jury to consider a defendant's prior bad acts in the area of sexual abuse or child molestation for the purpose of showing propensity.[7] . . .

"The admission of evidence of . . . uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . .

[T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . [T]he burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant . . . [who] must show that it is more probable than not that the erroneous action of the court affected the result." (Citations omitted; footnote altered; internal quotation marks omitted.) *State* v. *George A.*, 308 Conn. 274, 293–95, 63 A.3d 918 (2013).

Applying *DeJesus* to the present case, we conclude that, although the conduct alleged was not too remote in time and that the victims share some similarities, the facts alleged in the case of C1 were sufficiently dissimilar, reflecting significant qualitative differences, from the facts alleged in the cases involving C2 and C3, and that the unduly prejudicial effect of that evidence barred its cross admissibility. Likewise, the facts alleged in the cases of C2 and C3 were sufficiently dissimilar from the facts alleged in the case of C1, and the unduly prejudicial effect of that evidence barred its cross admissibility in the case of C1.

The defendant relies in part on *State* v. *Gupta*, supra, 297 Conn. 226–27, to support his contention that the conduct at issue in C1's case was sufficiently dissimilar to the conduct at issue in C2's and C3's cases to be cross admissible in those cases. In *Gupta*, a case involving the conduct of a physician with three of his female patients, our Supreme Court explained in detail that evidence in the cases against the defendant was not cross admissible because the case involving one victim, M, was "too dissimilar" from the cases involving two other victims, D and J: "Although the defendant improperly touched the breasts of D and J during a purportedly legitimate examination, his conduct toward M was markedly different, far more egregious and could in no way be mistaken for a proper medical examination. In addition to feeling her breasts with his fingertips and grabbing both of her breasts with his hands—the only conduct common to all three victims—the defendant kissed M on her cheeks, remarked that her breasts were soft and beautiful and pinched her nipples. . . . While he examined M's stomach, he remarked that it was flat, exposed the top of her private area, tapped her pelvic bone and commented that she was shaved and that she was so hot. . . . Even after M told the defendant that the examination was over, he again firmly massaged M's breasts with both of his hands, asked if he could kiss her breasts, and although M replied no, proceeded to put his mouth on each breast and to suck briefly on them. . . . When M jumped up from the table, pulled down her shirt and said, No, we are done. That is enough, the defendant persisted by putting his hands underneath her shirt, grabbing her breasts, and asking to feel her while she was sitting up. . . . [T]his evidence . . . demonstrates, in short, that the case involv-

ing M reflected significant qualitative differences from those involving D and J that were not merely a matter of degree." (Citations omitted; internal quotation marks omitted.) Id.

In the present case, we conclude that the dissimilarities among the conduct in the defendant's three cases are even more extreme than the dissimilarities present in *State* v. *Gupta*, supra, 297 Conn. 226–27. Although there was evidence that the defendant inserted a rag covered finger into the "butts" of both C2 and C3 and scrubbed their penises while C2 and C3 bathed, the boys stated that the defendant remained clothed while he did this and that he did not ask or demand that the boys touch him. On the other hand, his alleged conduct toward C1 was far more sexually egregious and in no way could have been mistaken for an aggressive bathing practice. There are real and significant differences between the allegations involving C1 and those involving C2 and C3. See *State* v. *Gupta*, supra, 242 (*Palmer, J.*, concurring).

In addition to evidence that the defendant inserted his finger into the "butt" of C1 while she bathed, there also was evidence that he inserted his finger and his penis into her "private," that he attempted to insert his penis into her 'butt" and her ear, that he ejaculated on her several times, and that he forced her to perform fellatio on him, causing her to vomit. Many of the defendant's actions against C1 took place in the bedroom, where he either was partially clothed or completely unclothed. Regarding the crimes of sexual assault in each of the three cases, the only conduct arguably common to all three victims was the defendant's insertion of his finger into their "butts" while they bathed. The evidence involving C1 clearly reflects significant qualitative differences from those involving C2 and C3 that were not merely a matter of degree. See id.; see also *State* v. *Ellis*, 270 Conn. 337, 378, 852 A.2d 676 (2004) (holding that court abused discretion in consolidating cases of three victims "because the defendant's abuse of [the first victim] was substantially more egregious than his abuse of the other two [victims]").

Having concluded that the facts alleged in the case involving C1 were so dissimilar, physically and factually, as to reflect significant qualitative differences from the facts alleged in the cases involving C2 and C3, we next address whether the probative value of the cross admissibility of evidence in these cases, nonetheless, would outweigh "the prejudicial effect that invariably flows from its admission." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 288 Conn. 473. We conclude that the inevitable dangers of joinder in this case derive from the likelihood that the jury improperly considered evidence of the defendant's conduct toward C1 to establish the elements and to find him guilty of the charges stemming from his conduct toward C2 and

C3, even though such evidence would not have been admissible at separate trials. See *State* v. *Gupta*, supra, 297 Conn. 230; *State* v. *Boscarino*, supra, 204 Conn. 723 ("[j]oinder gave the state the opportunity to present the jury with the intimate details of each of these offenses, an opportunity that would have been unavailable if the cases had been tried separately"). Having concluded that the evidence in the cases was not cross admissible, we, nevertheless, must consider whether the court abused its discretion in denying the defendant's motion to sever the cases, causing the defendant to suffer substantial prejudice. See *State* v. *Gupta*, supra, 231–32; *State* v. *Randolph*, 284 Conn. 328, 337, 933 A.2d 1158 (2007) ("[s]ubstantial prejudice does not necessarily result from a denial of severance even [if the] evidence of one offense would not have been admissible at a separate trial involving the second offense" [internal quotation marks omitted]).

B

The *Boscarino* Factors and Substantial Prejudice

In *State* v. *Boscarino*, supra, 204 Conn. 722–24, our Supreme Court identified several factors that a trial court should consider in deciding whether multiple cases should be joined or severed to avoid substantial prejudice resulting from consolidation of multiple cases for trial. "These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios;[8] (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Footnote added; internal quotation marks omitted.) *State* v. *Payne*, supra, 303 Conn. 545. When we examine whether severance was necessary to avoid undue prejudice, we, in effect, "weigh the risk that the jury will improperly use evidence that is introduced for proper purposes, despite the instructions of the court regarding the proper use of that evidence. This indeed is similar to the process that our courts employ in determining the admissibility of evidence regarding prior convictions and other misconduct of the defendant." *State* v. *Gupta*, supra, 297 Conn. 232.

In *Gupta*, after concluding that the evidence related to the individual victims was not cross admissible as propensity evidence, our Supreme Court, rather than analyzing each of the factors set forth individually in *Boscarino*, agreed with the Appellate Court's determination that the inherent risks associated with improper joinder were present in that case because the allegations of abuse involving one of the victims was much more egregious than the allegations involving the other two victims and that the evidence of that behavior was far more prejudicial than probative, thus focusing on

the second *Boscarino* factor and the prejudice resulting therefrom: "Accordingly, we turn again to the Appellate Court's recitation of the general inherent risks associated with improper joinder as well as the specific dangers evident in the present appeal. Throughout the trial and numerous times in the charge to the jury, the court told the jury to consider the three cases separately. Nevertheless, there was some prejudice to the defendant that even proper instructions from the court could not cure. . . .

"In the present case, some of these risks are present. For instance, there were several charges made against the defendant, and this litany of charges may have convinced the jury that he had to have committed at least one of the crimes with which he was charged. Second, the jury may have cumulated the evidence from all of the cases to find the defendant guilty in J's and M's cases. . . .

"In summary, because the defendant's behavior with respect to M was far more egregious than his behavior with respect to J and D, and the evidence of that behavior was far more prejudicial than probative, we conclude that the defendant was deprived of his right to a fair trial by the improper joinder of the cases." (Citation omitted; internal quotation marks omitted.) Id., 232–33; see also *State* v. *Ellis*, supra, 270 Conn. 369, 378 (trial court abused discretion in consolidating cases involving three victims because defendant's abuse of first victim was substantially more egregious than abuse of other two girls, and court's instructions to jury were insufficient to cure substantial prejudice that resulted from improper joinder).

We also look to the *Ellis* case. In *Ellis*, the defendant was charged with sixteen counts of sexual misconduct involving three victims, Sarah S., Julia S. and Kristin C., which had been joined for trial. *State* v. *Ellis*, supra, 270 Conn. 339, 360 n.16. On appeal, the defendant claimed, in part, that the court improperly had consolidated the cases for trial because the facts involving Sarah S. were far more shocking than the facts involving the other two victims and that the court's instructions to the jury were insufficient to cure the substantial prejudice that resulted from the improper joinder. Id., 368. Our Supreme Court agreed. Id., 369.

Julia S. and Kristin C. were young teenagers who played softball for the team that the defendant coached. Id., 343. Julia S. reported that the defendant had grabbed and groped her breast while they were in the defendant's office on one occasion. Id., 344. Kristin C. reported that the defendant had grabbed and squeezed her breast while they were wrestling in his office, and that he had grabbed her breast and tapped on her nipple on another occasion. Id., 345–46. Sarah S. did not play softball for the team that the defendant coached, but she knew the defendant through her father and her

sister, who did play on the defendant's team. Id., 346. The defendant began giving Sarah S.'s sister and others pitching lessons in the backyard of Sarah S.'s home, and he regularly met with Sarah S.'s father at their home as well. Id. The defendant first began having sexually explicit conversations with Sarah S. over the telephone, telling her that he was masturbating while they were talking. Id., 347. The conduct then became physical, with the defendant grabbing her breasts, running his hands up and down her body, and touching in between her legs. Id. This conduct also grew more pronounced, with the defendant sitting beside Sarah S. in her family room, opening his pants and trying to pull Sarah S.'s hand toward his exposed penis. Id., 348. When she pulled away, the defendant tried to move her face down to his penis. Id. Again, she pulled away, and the defendant then masturbated until he ejaculated. Id. There also was evidence of uncharged misconduct involving Sarah S. that was admitted at trial, as was other uncharged misconduct evidence involving another of the defendant's victims, Kaitlyn M. Id., 348–51.

Initially, the cases involving Sarah S., Julia S., and Kristin C. appeared on three separate informations, set to be tried separately. Id., 351. The defendant first sought to exclude evidence of the allegations made by Kaitlyn M., Julia S., and Kristin C. in his trial in the case involving Sarah S. on the ground that the allegations from the other girls were not similar to the allegations made by Sarah S., and that the admission of this evidence was far too prejudicial. Id., 352. The trial court denied the defendant's motion. Id. On appeal, our Supreme Court held that the trial court had committed error in not excluding the testimony of the other girls. It explained that the defendant's relationship with Sarah S. was different from his relationship with the other girls in that he did not coach Sarah S. on his softball team, and that, although the cases were proximate in time, "there were few similarities between his abuse of Sarah S. and his abuse of the other girls." Id., 358. Our Supreme Court also found that the denial of the defendant's motion to exclude this evidence was harmful because "[a]ny improper evidence that may have a tendency to excite the passions, awaken the sympathy, or influence the judgment, of the jury, cannot be considered as harmless." (Internal quotation marks omitted.) Id., 367–68. The court stated: "That the defendant's abuse of the other girls was not as severe as his abuse of Sarah S. does not mean that the evidence of such abuse was harmless. The sheer quantity of testimony concerning the defendant's abuse of the other girls was likely to have been harmful in its cumulative effect upon the jury's deliberations." Id., 368.

The next issue that our Supreme Court considered in *Ellis* was the defendant's claim that the trial court improperly granted the state's motion to join the cases of Sarah S., Julia S., and Kristin C. after denying his

motion to exclude. Id., 368. The defendant claimed that the court's ruling was improper under *Boscarino*. Id., 376. Similar to *Gupta*, the defendant in *Ellis* focused only on the second *Boscarino* factor. Id. He argued that the abuse of Sarah S. was so dissimilar to the abuse of the other victims, Julia S. and Kristin C., that the consolidation of Sarah S.'s case with the other cases "compromised the jury's ability to consider fairly the charges against him in the [other] cases . . . and that the trial court's instructions failed to mitigate the resulting prejudice because they did not clearly admonish the jury to consider each case separately." Id., 376–77. Our Supreme Court agreed, explaining: "The effect of testimony regarding the intimate details of sexual misconduct on a jury's ability to consider separate charges in a fair and impartial manner cannot be underestimated." Id., 377. The court further explained that the decision to admit the testimony of the other victims in Sarah S.'s case "had the corresponding effect of permitting the jury, following the joinder, to view the testimony of Sarah S. as bearing on the defendant's culpability with respect to [the other victims]." Id., 378. The court also concluded that the trial court's instructions to the jury did not mitigate the resulting prejudice from the improper joinder of the case. Id.

Unlike the trial court in *Gupta*, which specifically instructed the jury to consider each case involving the victims separately; see *State* v. *Gupta*, 105 Conn. App. 237, 249, 937 A.2d 746 (2008), rev'd in part on other grounds, 297 Conn. 211, 998 A.2d 1085 (2010); in *Ellis*, the trial court had instructed the jury that "[e]ach *charge* against the defendant is set forth [in] the information . . . and each *offense charged* must be considered separately . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Ellis*, supra, 270 Conn. 370. The court in *Ellis* also instructed: "*Each count* alleges a separate crime, joined for convenience of trial . . . . It will be your duty to consider *each charge or count* separately, and when you return to the courtroom you will be asked whether or not the accused is guilty as charged in *each of the counts* . . . ." (Emphasis added; internal quotation marks omitted.) Id., 373. Our Supreme Court pointed out that "although the court repeatedly instructed the jury to consider the seventeen counts separately, it never advised the jury at any point in the proceedings to distinguish the charges relating to Sarah S. from the charges relating [to the other victims]." Id., 379. Furthermore, the Supreme Court stated that the trial court improperly had instructed the jury that "if [the] evidence showed a common scheme on the part of the defendant . . . the jury could use that evidence to convict the defendant in each case." Id. The court held that "the defendant was substantially prejudiced by the joinder of the cases because the court instructed the jury that it could consider the significantly more egregious evidence of abuse in the case of

Sarah S. to convict the defendant in the cases of Julia S. and Kristin C." Id. After reversing the judgments of conviction, our Supreme Court, in its remand order, directed that "no evidence of a common scheme to abuse Julia S., Kristin C. or Kaitlyn M. will be admissible in the trial involving Sarah S., nor will evidence of a common scheme to abuse Sarah S. be admissible in the trials involving Julia S. or Kristin C." Id., 381.

In the present case, we conclude that the inherent risks associated with improper joinder were present in this case because the allegations of abuse involving C1 were far more egregious and substantially different than the allegations involving C2 and C3, that the evidence of that behavior was far more prejudicial than probative, and that the court's instructions to the jury did not cure that prejudice. The defendant faced eleven charges, contained in three separate informations, involving three different victims. Although the court told the jury that there were three separate informations and that *each count* was to be considered separately, it did not tell the jury to consider each information or case separately. The court specifically instructed the jury that it could use the evidence from each case in the other cases to prove the defendant's propensity to commit sexually abhorrent crimes, thereby essentially telling the jury that it could consider the significantly more egregious evidence of abuse in the case of C1 in determining whether the defendant was guilty in the cases of C2 and C3. See id. Furthermore, that fact that the allegations involving C2 and C3 were not as egregious as the allegations involving C1 does not mean that the evidence of such abuse was harmless in the case involving C1; the sheer quantity of testimony concerning the defendant's conduct toward the boys was likely to have been harmful in its cumulative effect upon the jury's deliberations. See id., 368. The jury certainly could have cumulated the evidence from each of the cases to find the defendant guilty in all of the cases.

As our Supreme Court previously explained: "We have recognized that the crime of sexual assault [is] violent in nature, irrespective of whether it is accompanied by physical violence. Short of homicide, [sexual assault] is the *ultimate violation of self*. It is also a violent crime because it normally involves force, or the threat of force or intimidation, to overcome the will and the capacity of the victim to resist. [Although sexual assault] is very often accompanied by physical injury to the [victim] . . . [it] can also inflict *mental and psychological* damage. . . .

"Not all crimes of sexual assault, however, are equally brutal and shocking. . . . For example, although [s]exual assaults in the first degree can be characterized as brutal . . . [s]ome . . . evince a greater degree of brutality or shocking behavior than others. The question then becomes whether one of the sexual assault crimes

. . . is so brutal and shocking when compared with the other, that a jury, even with proper instructions, could not treat them separately." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 377.

Accordingly, we conclude that the cases involving C2 and C3 were improperly consolidated for trial with the case involving C1, and we reverse the judgments of conviction and remand the cases for new trials.

II

Although our conclusion in part I of this opinion requires that the cases be remanded to the trial court for new trials, we also address the defendant's claims regarding the state's introduction of a dog to provide comfort and emotional support to C1 during her testimony because that issue is likely to arise again on retrial. See *State* v. *Gupta*, supra, 297 Conn. 234; *State* v. *Cote*, 286 Conn. 603, 627, 945 A.2d 412 (2008). The defendant claims that the court improperly permitted the state to have a dog sit near C1 while she testified to provide comfort and emotional support to her.[9] Under the facts of this case, we conclude that the court abused its discretion in permitting the use of the dog to comfort and emotionally support C1 while she testified without requiring the state to prove that this special procedure was necessary for this witness.

The following facts are relevant to our resolution of this claim. On July 5, 2011, the state filed a motion, specifically pursuant to General Statutes § 54-86g (b), "for special procedures," requesting, in part, that the court permit the use of a "therapy dog . . . to sit in close proximity to [C1] during the child's testimony, provided that such dog and the dog's handler shall not obscure the child from the view of the defendant or the jury . . . ."[10] During an initial hearing, the state explained that although C1 did not have any concerns about testifying in front of the defendant, she was concerned about the presence of other people. The state then explained that it thought the use of a "therapy dog" while she was testifying would comfort her, but that she had not yet met the dog. The court conducted, what it termed, a "*Jarzbek* level hearing" on the matter three days later. See *State* v. *Jarzbek*, 204 Conn. 683, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988). The state presented testimony from David Meyers, a child therapist, who owned a "service dog" named Summer. Meyers testified that he had purchased the "service dog" for therapeutic use in his practice. He also stated that this dog had never participated in a court hearing before and that she was not yet certified as a service dog. Meyers explained that service dogs or therapy dogs can be useful in alleviating some of the anxiety suffered by children. Meyers further testified that he and the dog had met C1 earlier in the day, spending one hour with

her, and that they had visited the courtroom together. Although C1 initially refused to touch the dog and said she was fearful, she soon warmed up to it and then told Meyers that she would feel more comfortable if the dog were with her when she testified in court. Upon questioning by defense counsel, Meyers stated that he was unaware of any studies that had determined that the testimony of a witness would be more reliable or truthful if a therapeutic dog were present during the testimony. He further testified that he had never met C1 before that day, that his interaction with her was only in the presence of the dog, and that he had no idea how she would have acted had the dog not been present. He also acknowledged that the anxiety C1 had that day could have been related to her fear of the dog and of meeting him for the first time. The defendant objected to the use of the dog, and argued that the use of the dog was not specifically permitted by § 54-86g (b), that the use of the dog would improperly influence the jury, making C1 appear to the jury even more sympathetic and vulnerable, and that there was no demonstrated need for the use of the dog.

Following the hearing, the court stated that it had conducted some independent research and was taking judicial notice of the website www.courthousedogs.com and that it believed it had the authority to allow the presence of the dog pursuant to § 54-86g and the exercise of the court's discretion. The court then ruled, after "applying a strict standard of clear and convincing evidence, that . . . [it] should allow all reasonable tools to make the courtroom a place of comfort and reliability for any witness, but especially a child witness, who, it is alleged, has faced child sexual abuse." The court then explained that any potential prejudice resulting from the presence of the dog would be cured "with proper curative instruction[s] from the court and [from] other appropriate safeguards that [it] intend[ed] to take." In its instructions, the court referred to the dog as a "service dog" rather than a therapy dog or facility dog. We conclude that § 54-86g as currently written does not give the court the specific authority to allow the presence of a dog while a child witness testifies and that, although the court has the inherent discretion to allow the use of comfort tools, under the facts of this case, the court abused its discretion because there was no proper prior showing that C1 needed the presence of the dog when she testified.

We first address whether the court had the authority under § 54-86g (b) to permit the dog to sit next to C1 while she testified. This presents an issue of statutory construction. "The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied

to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *State* v. *Thompson*, 305 Conn. 806, 818–19, 48 A.3d 640 (2012).

Section 54-86g (b) provides: "In any criminal prosecution of an offense involving assault, sexual assault or abuse of a child twelve years of age or younger, the court may, upon motion of the attorney for any party, order that the following procedures be used when the testimony of the child is taken: (1) Persons shall be prohibited from entering and leaving the courtroom during the child's testimony; (2) an adult who is known to the child and with whom the child feels comfortable shall be permitted to sit in close proximity to the child during the child's testimony, provided such person shall not obscure the child from the view of the defendant or the trier of fact; (3) the use of anatomically correct dolls by the child shall be permitted; and (4) the attorneys for the defendant and for the state shall question the child while seated at a table positioned in front of the child, shall remain seated while posing objections and shall ask questions and pose objections in a manner which is not intimidating to the child."

The text of this statute clearly states what special courtroom procedures it permits for child victims who were under the age of twelve when they suffered abuse: a court may prohibit persons from entering and leaving the courtroom, require attorneys to remain seated, permit the use of anatomically correct dolls to elicit testimony, and permit an adult with whom the child is familiar to sit in close proximity to the child during testimony; the statute also forbids intimidating questioning or objections. The use of a live dog is not listed as a special procedure. Prior judicial interpretation of the statute has narrowly limited it to its terms. See also *State* v. *McPhee*, 58 Conn. App. 501, 506–507, 755 A.2d 893 (§ 54-86g [b] does not apply to child witness holding stuffed animal while testifying), cert. denied, 254 Conn. 920, 759 A.2d 1026 (2000). Accordingly, we conclude that the court did not have the authority, pursuant to the plain and unambiguous text of § 54-86g (b), to permit a dog to sit beside C1 while she testified.

We next examine whether the court had discretionary authority separate from its statutory authority pursuant to § 54-86g (b) to permit the dog to sit near C1 while she testified. Under the facts of this case, we conclude that the court did have such inherent general discretionary authority to do so despite the absence of specific

authority pursuant to § 54-86g (b), but that the court abused its discretion under the facts of this case.

"The function of the court in a criminal trial is to conduct a fair and impartial proceeding. . . . A trial judge in a criminal case may take all steps reasonably necessary for the orderly progress of the trial. . . . When the rights of those other than the parties are implicated, [t]he trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. . . . Moreover, [t]he [ability] of a witness [to testify reliably] is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law." (Citations omitted; internal quotation marks omitted.) *State* v. *Torres*, 60 Conn. App. 562, 569–70, 761 A.2d 766 (2000), cert. denied, 255 Conn. 925, 767 A.2d 100 (2001).

Although the issue of using a dog as a comfort tool for a child witness is an issue of first impression in our state, we find guidance in other cases from our state and from our fellow states, which aid us in our analysis.

We first look to *Torres*, a case in which the trial court permitted the fiancé of the witness to sit beside her while she testified. Id., 569. The witness, who had been approximately twelve years old at the time the six years of sexual abuse began, became extremely frightened when called to testify in court. Id., 564–65. "Upon entering the foyer of the courtroom, she broke down and cried, 'No, no, no.' [She] refused to proceed into the courtroom to testify." Id., 565. The state asked the court to permit the witness' fiance to sit outside the witness box while she testified. Id., 565–66. The court granted the request. Id. On appeal, the defendant claimed that the presence of the fiancé bolstered the witness' credibility. Id., 569. The Appellate Court disagreed: "The evidence adequately supports the court's decision to allow [the witness'] fiance to be seated next to the witness during her testimony. The court based its decision on testimony concerning [the witness'] mental capacity and the court's own observations of [the witness'] distress and anxiety about testifying. . . . Implicit in the court's decision is the finding that [the witness] *required the accommodation* in order to provide testimony." (Emphasis added; footnotes omitted.) Id., 570.

We also look to *State* v. *Palabay*, 9 Haw. App. 414, 417, 844 P.2d 1 (1992), cert. denied, 74 Haw. 652, 849 P.2d 81 (1993), a case wherein the victim, who was twelve years old at the time she testified, had been asked to approach an exhibit board, when defense counsel noticed, for the first time, that the victim was holding a teddy bear. Id., 420. Counsel objected and argued that there had been no showing that the teddy bear was necessary for the victim's testimony. Id., 421. The court initially overruled the objection, but when

counsel objected a second time, the court sustained the objection. Id. On appeal, the defendant claimed that the court erred in overruling his first objection, which deprived him of his constitutional right to a fair trial. Id. He argued that "the teddy bear bestowed on [the victim] an unwarranted aura of vulnerability, naivete, ingenuousness, purity, and credibility . . . ." (Internal quotation marks omitted.) Id. In this issue of first impression in Hawaii, the Intermediate Court of Appeals agreed with the defendant that the trial court committed error, holding that "there [was] no evidence . . . to indicate the *compelling necessity* for [the victim] to hold a teddy bear while testifying. Absent the finding of necessity . . . [it] conclude[d] that it was error for the trial court to allow [the victim] to testify while holding a teddy bear." (Emphasis added.) Id., 424. The court ultimately, however, determined that the error was harmless.[11] Id., 434.

More on point with the present case, our research has found three cases that have considered the use of a dog to aid a victim while he or she testified. Recently, in *State* v. *Dye*, 178 Wn. 2d 541, 309 P.3d 1192 (2013) (en banc), the Washington Supreme Court considered, for the first time, whether it was error for the trial court to permit the use of a facility dog to aid the testimony of a victim who had the mental age of a child between the ages of six and twelve. Id., 544, 549. The Supreme Court explained: "This case requires us to determine whether a court may allow a witness to be accompanied by a comfort animal, here a dog, when testifying during trial. . . . We recognize that some trial procedures, such as providing a child witness with a toy on the stand or shackling a defendant at trial, may risk coloring the perceptions of the jury. But trial courts are capable of addressing these risks." Id., 543–44.

In *Dye*, the victim was a mentally disabled man whose home had been burglarized, after which he had become very fearful. Id., 544–45. Before trial, the victim was interviewed by the defense, while in the company of the prosecutor's facility dog. Id., 545–46. The victim then asked that the dog be permitted to sit beside him when he testified because he was fearful of the defendant. Id., 546. The court granted the request. Id. The Court of Appeals affirmed the defendant's conviction, and the case further was appealed to the Washington Supreme Court, where the defendant claimed that the dog's presence violated his rights to due process and a fair trial. Id., 547. In this issue of first impression, the court analyzed cases from around the country involving the use of special procedures, including a doll, a toy, a dog, and other things, and found that the cases had several things in common: (1) most employed the abuse of discretion standard; (2) the cases involved highly egregious facts; and (3) the cases were split on "whether the prosecution must prove that the special measure is necessary to secure the [witness'] testimony." Id., 551.

The court discussed the varying requirements from different states, ranging from the "substantial need standard" in Delaware, to the "compelling necessity" standard in Hawaii, to the requirement that the record "clearly indicat[e] that the witness would have difficulty testifying in the absence of the comfort item or support person" in several other states. Id., 552. The Washington Supreme Court then determined that the most appropriate standard for the trial court to employ is that the witness have a need for the support animal and that the court consider that need. Id., 553. Applying the abuse of discretion standard, the Washington Supreme Court then stated that the trial court in that case clearly had understood that the dog *was needed* to facilitate the victim's testimony because of his mental disability and that the trial court impliedly found that the victim would not testify without the dog. Id., 554–55. Accordingly, the court held: "Here, the trial court acted within its broad discretion when it determined that Ellie, the facility dog provided by the prosecutor's office to the victim . . . *was needed* in light of [the victim's] severe developmental disabilities in order for [the victim] to testify adequately." (Emphasis added.) Id., 544.

The second case involving the use of a dog is *People* v. *Tohom*, 109 App. Div. 3d 253, 969 N.Y.S.2d 123 (2013). In *Tohom*, the sexual assault victim was experiencing symptoms of post-traumatic stress disorder, had expressed anxiety about having to testify and did not feel safe because of "the way that members of her family have made her feel about this situation . . . ." Id., 257. The state filed a motion to allow the victim to testify in the presence of a dog that had been very useful to the victim during interviews and in therapy sessions. Id. 256. The state argued that the dog would be akin to a supportive person, who is allowed to accompany a child witness under New York Executive Law § 642-a.[12] Id. The trial court permitted the dog to accompany the victim while she testified, finding that the victim's "testimony was likely to cause severe emotional, mental and psychological stress, which necessitates the consideration of procedures to protect [her] mental and emotional well-being while testifying." (Internal quotation marks omitted.) Id., 258. On appeal, the defendant argued, inter alia, that § 642-a did not give the court the authority to permit the use of the dog and that his right to a fair trial was violated. Id., 260. In this issue of first impression in New York, the New York Appellate Division stated that, although the language of § 642-a did not permit the use of dog specifically, the stated "purpose of the legislation was to address the emotional stress [that] a child victim might endure . . . ." Id., 261. Accordingly, it concluded that § 642-a applied in that case, giving the court the authority to permit the use of a "therapy assistance animal." Id. As to the defendant's argument that the state first must show compelling necessity under § 642-a, the court held that § 642-

a contained no such requirement, but that the trial court was allowed to "[fashion] . . . an appropriate measure to address a testifying child witness's emotional or psychological stress, based upon *the particular needs of that child* . . . ." (Citations omitted; emphasis added.) Id., 266. The court also considered the defendant's claim that his right to a fair trial was tainted because the dog engendered sympathy for the victim. Id., 268. The Appellate Division disagreed, concluding that the trial court properly had balanced the "*need for* [*the dog*] during [the victim's] testimony against the potential prejudice to the defendant." (Emphasis added.) Id., 271.

Finally, in *People* v. *Spence*, 212 Cal. App. 4th 478, 151 Cal. Rptr. 3d 374 (2012), review denied, 2013 Cal. LEXIS 3209 (Cal. April 10, 2013), the California Court of Appeal also considered the use of a dog to aid a child victim while she testified. The victim was very emotional when discussing her abuse with health workers, and the state asked that the court allow it to use a dog because it was concerned that the victim would have an "emotional meltdown and refuse to testify . . . ." Id., 512. The trial court granted the state's motion. Id. On appeal, the defendant argued, inter alia, that the court had to find necessity before granting this special request. Id., 511. The court found no error, concluding that the trial court had made "*implied findings of necessity* . . . ." (Emphasis added.) Id., 518.

We find these cases and the analysis employed therein informative. In the present case, we conclude that although the court has the inherent general discretionary authority to permit a suitably trained dog to sit near a witness when a need clearly is demonstrated, in this particular case, the court abused its discretion in granting the state's motion to permit the dog to sit near C1 on the witness stand while she testified because there was no finding, nor was there a showing, that this special procedure was needed.

Here, C1 was not afraid to testify in front of the defendant, but she was uncomfortable with all the other people in the courtroom. In response to that concern, the court ordered that the doors to the courtroom be closed, that the courtroom be kept quiet, and that people refrain from coming and going during C1's testimony. On the day of the hearing on the motion for special procedures, the state brought in a therapist, Meyers, whom C1 had never met and a dog that she did not know and of which she initially was afraid. Meyers and the dog spent only one hour with C1 before he testified about the benefits of therapy dogs and about the calming effect that this dog had on C1 once she became comfortable with it. When asked by defense counsel whether C1's initial discomfort and anxiety could have been because of her fear of meeting him and the dog for the first time, Meyers said yes, and explained that C1 had been quite afraid of the dog

initially. He admitted to never having met C1 outside of the presence of the dog and that he had no idea if the presence of the dog would increase C1's reliability or truthfulness when she testified. He also stated that he had never used this dog at a jury trial before and that she was not yet certified as a service dog.

In ruling on the state's motion to allow the use of the dog, the court stated that it found by clear and convincing evidence that it "should allow all reasonable tools to make the courtroom a place of comfort and reliability for any witness, but especially a child witness, who it is alleged, has faced child sexual abuse," but the court did not make any finding that *there was a need for this special procedure* to be implemented for C1, and that use of such special procedure would not deny the defendant a fair trial. Accordingly, we conclude that the court abused its discretion.[13]

The judgments are reversed and the cases are remanded for new trials.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The defendant was charged in docket number CR-10-642409 with three crimes related to C1, one count of sexual assault in the first degree for engaging in sexual intercourse with her, one count of risk of injury to a child for showing her a pornographic movie and another count of risk of injury to a child for having contact with her intimate parts in a sexual and indecent manner likely to impair her morals.

[2] The defendant was charged in docket number CR-10-642410 with five crimes related to C2, two counts of sexual assault in the first degree for engaging in sexual intercourse with him, one count of risk of injury to a child for showing him a pornographic movie, and two counts of risk of injury to a child for having contact with C2's intimate parts in a sexual and indecent manner likely to impair his morals.

[3] The defendant was charged in docket number CR-10-643139 with three crimes related to C3, one count of sexual assault in the first degree for engaging in sexual intercourse with him, one count of risk of injury to a child for showing him a pornographic movie, and one count of risk of injury to a child for having contact with C3's intimate parts in a sexual and indecent manner likely to impair his morals.

[4] As explained in *State* v. *LaFleur*, 307 Conn. 115, 159, 51 A.3d 1048 (2012): "It is clear that, in light of *Payne*, the trial court should not have applied a presumption in favor of joinder. *State* v. *Payne*, supra, 303 Conn. 547–49. That impropriety is not dispositive, however, in light of the trial court's determination that none of the *Boscarino* factors were present."

[5] The court later instructed the jury, however, that the evidence from each case was cross admissible in the other cases to prove the defendant's propensity to commit crimes of an "abhorrent and compulsive" sexual nature.

On appeal, in addition to addressing the *Boscarino* factors, both parties address this claim in light of the propensity standard for the admission of misconduct evidence in cases concerning crimes of a sexual nature that was adopted in *State* v. *DeJesus*, supra, 288 Conn. 470–74. In accordance with our Supreme Court's established practice, we will review this issue pursuant to the propensity exception articulated in *DeJesus* because the factors that guide our inquiry remain the same. See id., 476–77 ("[i]n assessing the relevancy of such evidence, and in balancing its probative value against its prejudicial effect, the trial court should be guided by this court's prior precedent construing the scope and contours of the liberal standard pursuant

to which evidence of uncharged misconduct previously was admitted under the common scheme or plan exception"); see also, e.g., *State* v. *Gupta*, 297 Conn. 211, 225 n.7, 998 A.2d 1085 (2010) ("[T]he underlying decisions in the present case rested on the cross admissibility of the evidence under the liberal common plan or scheme exception, not the propensity exception. As *DeJesus* makes clear, however, although we changed the label of the exception, we did not change the parameters that such evidence must satisfy to be admissible.").

[6] We do not rule on each charge in each information separately, but rule on each information as a whole. Although it is possible that some of the evidence related to certain charges in the separate informations might be cross admissible, we conclude that the evidence as a whole in the case involving C1 is not cross admissible in the cases involving C2 and C3, and vice versa.

[7] Following the release of *State* v. *DeJesus*, supra, 288 Conn. 418, § 4-5 of the Connecticut Code of Evidence was amended to conform to that decision. The rule, as amended, provides: "(a) General Rule. Evidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person except as provided in subsection (b).

"(b) When evidence of other sexual misconduct is admissible to prove propensity. Evidence of other sexual misconduct is admissible in a criminal case to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if: (1) the case involves aberrant and compulsive sexual misconduct; (2) the trial court finds that the evidence is relevant to a charged offense in that the other sexual misconduct is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise similar in nature and circumstances to the aberrant and compulsive sexual misconduct at issue in the case; and (3) the trial court finds that the probative value of the evidence outweighs its prejudicial effect.

"(c) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

"(d) Specific instances of conduct when character in issue. In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct." Conn. Code Evid. § 4-5 (effective January 1, 2012), 73 Conn. L.J. No. 1, pp. 211PB-212PB (July 5, 2011).

[8] The defendant points out in his brief: "In reaching its ruling, the court acknowledged the bind the defendant is placed in when, on one hand, for purposes of *Boscarino*, the defendant must argue that the cases are so similar that the jury will confuse them and improperly aggregate the facts, and, on the other hand, for the purposes of *DeJesus*, the defendant must argue that the facts are discernible and distinct and thus not cross admissible as misconduct evidence." We acknowledge that these opposing factors could put a defendant in an untenable position.

[9] The defendant claims that his right to a fair trial and his right to confrontation were violated. We note, however, that the defendant specifically told the trial court that he was *not* making a confrontation clause claim related to the dog issue. Accordingly, we consider that claim waived.

[10] We recognize that there is a differentiation between service dogs, therapy dogs and facility dogs. Although this and other nomenclature frequently is used interchangeably to describe some specially trained dogs, as occurred in the present case, those dogs serve different functions and generally have different training.

Service dogs, which include, inter alia, guide dogs or assistance dogs; see General Statutes §§ 46a-44 and 46a-64; are dogs that are specially trained to provide aid to people with physical disabilities. The ability to use service dogs in public buildings or places of accommodation is protected by federal and state antidiscrimination laws. See, e.g., General Statutes §§ 46a-44 and 46a-64.

For purposes of implementing the Americans with Disabilities Act, the civil rights division, disability rights section, of the United States Department of Justice, defines service animals as "dogs that are individually trained to do work or perform tasks for people with disabilities . . . includ[ing] guiding people who are blind, alerting people who are deaf, pulling a wheelchair . . . reminding a person with mental illness to take prescribed medications,

calming a person with Post Traumatic Stress Disorder . . . during an anxiety attack, or performing other duties. Service animals are working animals, not pets. The work or task a dog has been trained to provide must be directly related to the person's disability. Dogs whose sole function is to provide comfort or emotional support do not qualify as service animals under the [Americans with Disabilities Act]." United States Department of Justice, "ADA 2010 Revised Requirements: Service Animals," (July 2011), available at http://www.ada.gov/service animals 2010.pdf (last visited May 13, 2014).

The preferred term for a dog used in a courthouse setting to provide comfort to a witness is " 'facility dog,' [al]though cases and the literature on the subject have also called them testimony dogs, courthouse dogs, companion dogs, therapy dogs, service dogs, comfort dogs, therapy assistance dogs, support canines, and therapeutic comfort dogs. Most of these terms imply canine functions in providing comfort or reducing anxiety and should be avoided because the function of the dogs in a courtroom setting is far more specific. Most dogs described in cases [thus] far have been trained in a manner similar to how therapy dogs are trained, but not all dogs were actually trained or certified therapy dogs so this term would also be confusing. A service dog is generally a dog that assists a particular individual with a disability . . . . Therefore, that term is also best avoided. Companion dogs are generally pets . . . . Calling a dog a courthouse dog has a clever journalistic ring, but might suggest the dog lives in the courthouse . . . ." J. Ensminger, Animal Legal & Historical Center, Michigan State University College of Law, "Recent Cases on the Use of Facility Dogs by Witnesses While Testifying" (2012) p. 2, available at http://www.animal-law.info/articles/arusensmingerfacilitydog2012.htm (last visited May 13, 2014).

"A facility dog can interact with people in courthouse public areas, child advocacy centers, and drug courts; play with office staff; participate in forensic interviews; calm victims and witnesses; and accompany witnesses to the stand in a courtroom. Facility dogs are not the same as therapy dogs. Courtroom work can be stressful for an inadequately trained dog—there may be angry shouts, an upset defendant, weeping witnesses, and crowded benches. Therapy dog training is not the appropriate training for a dog [that] will be in court accompanying witnesses to the stand. The professional working dog will be less affected by the stress of a courtroom trial activity. See www.courthousedogs.com/pdf/Therapy%20Dogs.pdf." G. Sandoval, "Court Facility Dogs—Easing the Apprehensive Witness," 39 The Colorado Lawyer 17 n.5 (April 2010).

[11] In *State* v. *Aponte*, 249 Conn. 735, 745, 738 A.2d 117 (1999), our Supreme Court determined that the defendant's right to a fair trial was jeopardized by the prosecutor's gifting of a Barney doll to a child victim to hold while she testified. In dicta, however, the court stated that a child bringing a special doll from home would be permissible. Id., 744–45. The court explained: "The defendant acknowledges that it would have been proper to allow the victim to bring a doll from home to hold as a comfort object during her testimony. See, e.g., *State* v. *Palabay*, supra, 9 Haw. App. 417. Many children derive comfort from a favorite toy or stuffed animal. A child witness should be permitted to bring their particular favorite object with them. These comforting objects are more than mere toys. They symbolically represent a little bit of a mother's ability to soothe the child when frightened or nervous. Their presence helps children calm themselves when parents are not immediately on hand. . . . J. Myers, K. Saywitz & G. Goodman, Psychological Research on Children as Witnesses: Practical Implications for Forensic Interviews and Courtroom Testimony, 28 Pac. L.J. 3, 71 (1996). Therefore, had the victim simply brought a favorite object from home, there would have been no basis for objection." (Internal quotation marks omitted.) *State* v. *Aponte*, supra, 744–45. We are confused by the court's reliance on *Palabay* to support the proposition that a child properly could bring a doll from home to hold while he or she testified in light of the holding in *Palabay* that it was error for the trial court to have allowed the child to hold a teddy bear without a showing of necessity. See *State* v. *Palabay*, supra, 424. Nevertheless, because this language was not necessary to the court's holding in *Aponte*, we view it as dicta.

[12] "Executive Law § 642-a states, in pertinent part:

"To the extent permitted by law, . . . the courts shall comply with the following guidelines in their treatment of child victims: . . .

"4. The judge presiding should be sensitive to the psychological and emotional stress a child witness may undergo when testifying.

"5. In accordance with the provisions of article sixty-five of the criminal procedure law, when appropriate, a child witness . . . should be permitted to testify via live, two-way closed circuit television.

"6. In accordance with the provisions of section 190.32 of the criminal

procedure law, a person supportive of the child witness or special witness . . . should be permitted to be present and accessible to a child witness at all times during his testimony, although the person supportive of the child witness should not be permitted to influence the child's testimony." (Internal quotation marks omitted.) *People* v. *Tohom*, supra, 109 App. Div. 3d 261–62.

[13] Because the judgments of conviction are being reversed and the cases are being remanded for new trials, we need not examine whether the court cured any possible prejudice by its very thorough and thoughtful jury instructions related to the issue of the dog.